## UNITED STATES v. RAYBURN et al.

### No. 10811.

Circuit Court of Appeals, Eighth Circuit.

June 25, 1937.

W. Croft Jennings, Sp. Asst. to Atty. Gen. (James W. Morris, Asst. Atty. Gen., Sewall Key and Norman D. Keller, Sp. Assts. to Atty. Gen., Edwin G. Moon, U. S. Atty., of Ottumwa, Iowa, and C. I. Level, Asst. U. S. Atty., of Denison, Iowa, on the brief), for appellant.

John E. Cross and Ross R. Mowry, both of Newton, Iowa (W. Keith Hamill, of Newton, Iowa, on the brief), for appellees.

Before STONE, SANBORN, and THOMAS, Circuit Judges.

STONE, Circuit Judge.

This is an action for refund of income taxes for the years 1929 and 1930. From a judgment for plaintiffs, the United States appeals.

### Dismissal of Appeal.

Appellees urge a motion to dismiss this appeal on the ground that it was taken more than three months after the judgment.

The situation involved is that the court handed down a written opinion containing findings of facts and conclusions of law and ending as follows:

"The clerk will enter the following order:

"The above entitled cause having been duly tried on the 16th day of December, 1935, and submitted, the court finds for the plaintiffs and against the defendant in the sum of $22,361.03 with interest at six per cent per annum from September 15, 1932, until paid. Defendant's motion for judgment is overruled, to all of which the defendant excepts.

"Signed this 23 day of January 1936.

"Signed Chas. A. Dewey,
"United States District Judge."

The record contains no *entry* of the above judgment or other action than the *filing* of the above with the clerk on January 23, 1936. On January 30, 1936, a somewhat more formal form of judgment appears under the heading "Judgment Entry" with the statement "Filed in the U. S. District Court

on January 30th, 1936." At the close of the judgment appears:

"As of January 23, 1936

"To all of the foregoing the defendant excepts.

"Chas. A. Dewey,
"United States District Judge."

The appeal was taken on April 27, 1936, less than three months after January 30 but more than three months after January 23. The questions are (1) whether the judgment filed January 23, 1936, but never made of record otherwise is the appealable judgment and (2) whether the recital in the later judgment "As of January 23, 1936," carries that judgment back, as a nunc pro tunc order, to January 23 for appealable time purposes.

■■■ (1) Proceedings for appeals in the federal courts are purely statutory. The statute governing here forbids appeals "unless application therefor be duly made within three months after the *entry* of such judgment" (28 U.S.C.A. § 230). (Italics added.) "Entry" of a judgment or order is a ministerial act of the clerk and usually means the setting out of the judgment in the proper record book of the court. Ex parte Morgan, 114 U.S. 174, 175, 5 S.Ct. 825, 29 L.Ed. 135; 34 C.J. § 175, pp. 44–46; § 183, p. 55; § 185, p. 57. In construing an earlier act governing time for appeals which contained the same requirement as to "entry of judgment," the Supreme Court construed "entry" to mean entry in "the order-book, or record of the court's proceedings." Polleys v. Black River Co., 113 U.S. 81, 84, 5 S.Ct. 369, 370, 28 L.Ed. 938. The rules of court in this District provide for "A law journal, in which shall be entered all orders, judgments, and proceedings of the court in law actions." This journal is "the order-book, or record of the court's proceedings" within the Polleys Case, supra, and it is entry therein which complies with the statutory requirement.[1]

■■■ (2) Does the recital in the judgment of January 30 "As of January 23, 1936,"

affect the appealable date of this judgment entered on January 30? The length of the statutory period for appeal can neither be lengthened nor shortened by any action of the parties or of the court. This applies to nunc pro tunc orders which would have the effect of extending (Old Nick Williams Co. v. United States, 215 U.S. 541, 544, 30 S.Ct. 221, 54 L.Ed. 318; Garrison v. Cass County, 5 Wall. 823, 18 L.Ed. 491) or of shortening (Providence Rubber Co. v. Goodyear, 6 Wall. 153, 18 L.Ed. 762) such period. It is the date of "actual entry" which controls. Providence Rubber Co. v. Goodyear, 6 Wall. 153, 156, 18 L.Ed. 762.

■■■ We conclude that the appealable judgment here was the one entered January 30, 1936.[2] The motion to dismiss the appeal is denied.

The Merits.

Appellees are the surviving trustees of the "Iowa Realty Trust." They returned and paid taxes on the income received by them as trustees during the years 1929 and 1930 on the basis of deductions for distributions to beneficiaries—claiming that the liability and the rate of taxation properly applicable were those covering taxation of a trust. The Commissioner determined they were not taxable as a "trust" but as an "association." Protest payments were made in compliance with this ruling. This action is for refund of such payments. The trial court made findings of fact, stated conclusions of law, and gave judgment for plaintiffs.

The sole question presented here is whether this taxation should be on a trust or on an association. The court held, and there is no serious contention here to the contrary, that:

"The trust in this case so far as its form of organization is concerned has enough of the elements of a corporation to be classified as an association within the regulations of the Department."

The contest here concerns the "purpose" and the operations of the trust during these two years. Appellees contend the sole, or at least the main, purpose was to liquidate

---

1 Two instructive cases are In re Hurley Mercantile Co., 56 F.(2d) 1023 (C.C.A. 5), certiorari denied Atascosa County State Bank v. Coppard, 286 U.S. 555, 52 S.Ct. 580, 76 L.Ed. 1290, and The Washington, 16 F.(2d) 206 (C.C.A.2).

2 Our examination has been confined to the precise issue presented. That there is a difference between the rendition of a judgment and the entry thereof; that for some purposes a judgment rendered but not entered is effective; and that for other purposes entry is necessary are well recognized legal propositions [34 C. J. § 175, pp. 44–46, § 182, pp. 52–55; Continental Oil Co. v. Mulich, 70 F.(2d) 521, 524 (C.C.A.10)].

a large tract of land and not at all to engage in a business enterprise for profit and that any business engaged in was merely and purely incidental to the purpose of liquidation. Appellant contends (1) that one of the purposes of the trust was to hold the land "to await future opportunities" and, while so doing, business was carried on; and (2) even if the main purpose was liquidation and the business transacted was incidental to that purpose, yet the trust satisfied "all of the tests of doing business" because its actual operation under the trust was that "of a true business enterprise."

An outline of the facts (undisputed) pertinent to the issues here is as follows: In March, 1909, the Jasper County Realty Company was incorporated under the Iowa statutes for a term of twenty years. Its declared principal business was the purchasing, holding, owning, leasing, mortgaging, exchanging, and selling real estate and personal property. So far as this record shows, the only land acquired by this company was a block of approximately 12,460 acres in Pecos county, Tex. This land was flat with practically no vegetation except scrub mesquite and greasewood with a little grass. When this land was acquired, an irrigation project was in mind. In 1909 and 1910 about 800 acres were sold, but the irrigation project fell through and this land came back to the company. The only income of the company was 5 cents an acre for rental of grass land. The above situation continued until 1927. Early in that year an "oil flurry" arose in that vicinity and, during January and February, 1927, the company executed three ten-year oil leases, covering a total of 2,240 acres, on a bonus, rental, and royalty basis.[3]

In connection with these leases, a question was raised, by counsel for one of the oil companies, as to the title of the company to this land. It was suggested that, under the law of Texas, the company (a corporation) could not hold the land longer than

fifteen years and that it had held it longer than that. The directors and stockholders held informal meetings and discussed this situation, and also the short period the company charter still had to run—expiration being March 12, 1929.

The result of these conferences was the creation of a trust, "so that we could hold this property in Texas as we were about to lose our land," and the conveyance of the land to the trustees. This result was worked out through a conveyance of the land to the stockholders as tenants in common in proportion to stock holdings, dissolution of the company, and the creation and conveyance of the land to the trustee.[4]

The trust agreement was incorporated in a warranty deed. The instrument conveyed the land to seven named trustees "for the uses and purposes and upon the terms and conditions hereinafter set out." It named the beneficiaries (the tenants in common making the conveyance) and stated the "fractional interests in the trust property and funds" of each. Provisions of the trust agreement which throw light upon the issues here are as follows:

"Said conveyance is upon the following trusts, viz.:

"1. In trust to sell and convey and convert the same into money and distribute the net proceeds thereof among the persons at the time of such conversion holding and owning beneficial interests therein; it being however expressly understood and agreed that the Trustees may, in their uncontrolled discretion, defer or postpone such conversion and distribution except that the same shall not be postponed beyond the end of twenty years from and after the death of the last survivor of the persons hereinbefore named as trustees.

"2. In trust, pending final conversion and distribution of the property, to manage and control the same, the Trustees having, for such purposes and for all purposes of

---

[3] Another part of the record shows six outstanding leases on April 2, 1927.

[4] The stockholders' resolution was at a meeting on April 2, 1927. After stating that the charter "will shortly expire" and that "the Company at all times has been inactive, merely holding title to certain tracts of Texas land, collecting and distributing the rents therefrom and paying the taxes thereon," the resolution authorized the immediate transfer of this land and all other property to the stockholders (in proportion to stock owner-

ship), subject to six named leases and that, after such conveyance, the corporation be dissolved. This conveyance was executed April 4, 1927.

A combined deed and trust instrument (executed by the various former stockholders, between April 28 and June 14, 1927) passed the above title to seven trustees under the trust terms set forth therein. This latter deed was not filed of record in Pecos county until May 21, 1928.

sale, lease, and any and all arrangements, contracts and dispositions of the trust property, or any part thereof, all and as full discretionary powers and authority as they would have if they were themselves the sole and absolute beneficial owners thereof in fee simple.

"3. In trust to collect and receive all rents and income from the property, and annually or oftener at their convenience, to distribute such portion thereof as they may, in their discretion, determine to be fairly distributable net income, to and among the several cestuis que trustent, according to their respective fractional interests, the trustees in this connection having full authority from time to time to use any funds on hand, whether received as capital or income, for the purposes of any repair, taxes, or protection of the property held hereunder as the Trustees may determine to be wise and expedient, for the protection of the trust property as a whole pending its conversion and distribution. The determinations of the trustees made in good faith, as to all questions as between 'capital' and 'income' shall be final. * * *

"9. Any Trustee hereunder may resign by written instrument duly acknowledged and attached to the original of this instrument, or recorded where the original hereof is then recorded.

"Any vacancy in the office of the Trustees, however occasioned shall be filled by the remaining trustees by an instrument in writing, signed by them, and assented to in writing, by the holder or holders of two-thirds in amount of the beneficial interest herein, such appointment to be in like manner attached to the original of this instrument, or recorded as in the case of resignation last above provided for. * * *

"11. The terms and provisions of this trust may be modified at any time or times by instrument in writing, signed, sealed and acknowledged by the then Trustees, assented to in writing by two-thirds in interest of the cestuis que trustent, and attached to the original of this instrument, or recorded where the original hereof is then recorded. * * *

"13. The title of this trust (fixed for convenience) shall be 'The Iowa Realty Trust,' and the term Trustees in this instrument shall be deemed to include the original and all successor trustees.

"14. Any transfer or conveyance by any beneficiary or cestui que trust of his or her equitable interests in the trust property shall be subject to the provisions hereof, and to the rights of the trustees hereunder; and no cestui que trust shall have any right to compel a partition, division or distribution of any of the trust property during the life of the trust except as herein provided for.

"15. At the end of twenty years from and after the death of the last survivor of the trustees herein named, (unless this trust shall theretofore have been otherwise lawfully terminated), all the property of every kind then held hereunder shall be sold by the trustees and equitable distribution made of the net proceeds among the persons then entitled."

In June, 1928, the trustees made two oil leases covering 2,692 acres; in July, 1928, one lease covering 400 acres; in December, 1928, two leases covering 720 acres; in February, 1929, one lease covering 320 acres; in April, 1929, one lease covering 110 acres; in August, 1929, one lease covering 320 acres—a total of eight leases covering 4,562 acres, which, with the three (or six as may be) leases given by the company, made at least eleven leases covering 6,802 acres out of a holding of 12,460 acres. The bonuses paid for these leases varied—running from nothing in one lease to $88,000 in another and reaching a total of $204,848.

The only business carried on by the trustees was the making of these leases; the collection of bonuses and rentals (oil and grass); and distribution of the net proceeds to the beneficiaries. In the two years involved here (1929 and 1930) the gross returns were $180,854.07, of which $162,030 were distributed.

The "oil flurry" which created the opportunity for the above leasings was short-lived. It was based upon discovery of oil at a "shallow" depth—not over 3,000 feet. At the time of the trial below (December, 1935) interest in oil development in this general vicinity was reviving on the basis of a deeper deposit. Also, at that time, the United States was building a dam designed to furnish irrigation to lands in three counties, in one of which this land is located. How far this project will benefit this land is problematical as the nearest side of it is from one and one-half to four miles from the convoy canal under this irrigation project.

During the trust, no additional land has been acquired; there has been no development of the land by the trustees, and there

has been no purchase of royalty rights on adjoining land—the trustees believing that such transactions were outside their powers.

The trial court found that during these tax years the trustees were not "engaged in carrying on a business enterprise for profit as the main purpose of the organization"; and that "such business as they have done has been incidental to the ultimate liquidation of the property as provided in the trust deed." In stating his conclusion of law, the court said:

"A trust holding property purely for liquidating purposes is not such an association.

"The question is, was this trust association founded for, operated as, or by any subterfuge intended to be, an association in the nature of a business trust.

"There is no evidence of a subterfuge here and the actions of the trustees in the carrying out of the purposes of the trust were within the authority granted by the trust instrument. The question narrows down to the breadth, scope and limitations of the provisions of the trust agreement. As a background for an interpretation of the purposes expressed in that instrument the evidence discloses that the parties bought a large tract of real estate in Pecos County, Texas, intending to develop it by irrigation and making it a business project in the sale of lots or portions thereof for a profit. They organized a corporation for that purpose, but the purpose thereof failed.

"The parties then had this large tract of land on their hands, which then or within the near future could only be sold for a nominal price. This was not presently necessary as there was a small rental from grass lands and the taxes were not excessive. It was natural that a trust be formed for the purposes set out in the instrument, which are two-fold: (1) to hold the tract of land to await future opportunities and (2) to liquidate. At that time there was no probability of finding oil on the land, although among speculators that is always a hope. In 1929 and 1930 there did develop a belief that oil on the part of some speculators of finding oil on the land and enough of a belief was present to enable the trustees to sell portions of the land for oil development purposes. These developments failed and there is at present only a chance that it might again appear in the future.

"From this fact situation and the trust instrument, I am very clearly of the opinion that the trust purposes were to hold the land pending some future opportunity that might result in an advantageous sale, or upon failure of any such opportunity arising, to liquidate. I would designate it as a holding trust, and the purpose of the holding not to engage in a business venture but if something should develop within the period of the trust that would warrant it to then engage in a business enterprise, or liquidate.

"The sale of the land to third persons or interests in the land for oil development and the collection of bonuses therefor was but a fortuitous incident taken advantage of by the trustees in carrying out the holding and liquidating purposes of the trust instrument and did not in my opinion change those purposes to an engagement in a business enterprise.

"Making the test as to whether or not the trust was engaged in a business enterprise in the years in controversy, I conclude that they were not so engaged at that time."

We feel compelled to differ with the result reached by the trial court. There is no dispute in the evidence. If there is a place for difference in the fact result, it must lie in a situation where different inferences as to ultimate facts are permissible from the undisputed evidence. We think no such situation is here present. If we consider the trust instrument alone and apart from all other evidence, there is no basis therein to conclude that this was purely a liquidating trust. That instrument, considered alone, reveals twenty-four tenants in common of a large tract of land conveying it to seven of their number as trustees to be disposed of by the trustees at any time within twenty years after the death of the survivor of such trustees; the trustees given the full powers as of ownership to manage and control the land and all parts thereof until final disposition; provisions for succession as to trustees; provision for unlimited modification of the trust by the trustees and two-thirds in interest of the beneficiaries. The only feature which might suggest a purely liquidation trust or a holding trust is that the corpus is a definite tract of land and the main purpose is to dispose of that land. In the leading case of Morrissey v. Commissioner, 296 U.S. 344, 360, 56 S. Ct. 289, 80 L.Ed. 263, and the companion case of Swanson v. Commissioner, 296 U.S. 362, 365, 56 S.Ct. 283, 80 L.Ed. 273, a single

tract of land was involved. It is true that each of those cases dealt with trusts which contemplated improvement of the land before sale. However, it is obvious that the sale of land without prior improvement is as much a business enterprise for profit as any other business undertaking.

If we consider this instrument in the setting of the other evidence, as the trial court properly did, it becomes clear that this was not a mere liquidation or a mere holding trust. The Jasper County Realty Company was organized for the purpose of "purchasing, holding, owning, leasing, mortgaging, exchanging and selling" real estate and personal property for itself and others. These powers were exercised only in the purchase, rental, and attempted sale of this one tract of land which was early acquired and was held for eighteen years until the transfer to this trust. Thus the only actual business of the company was just what the succeeding trust was designed to accomplish. The enterprise was, originally, to sell this vacant land for profit in connection with an irrigation project. This project disappeared almost at the beginning leaving on hand the land with only a trivial value. For years, it was held without prospect of profitable disposition with no thought or attempt to terminate the enterprise by liquidation. In 1927, discovery of oil created a value in this land. The company awoke to take advantage of this fortunate change in conditions. It proceeded to realize upon the land through oil leases. For business reasons, the land was leased instead of sold. In this connection, it found it necessary to protect the title to the land. The doubt was as to the capacity of the company legally to hold title satisfactory to oil lessees. The sole reason for utilizing a trust was to meet this situation. There is no word in the testimony that the stockholders contemplated abandoning the enterprise. In fact, the enterprise was just coming into activity after lying moribund for years. It was in connection with and to take advantage of this activity that the change from corporation to trust was made. The enterprise went forward as never before. The trust provided for a term even longer than the life of the corporation within which to fully accomplish the enterprise which was the sole actual business of the company. The business was initiated for profit. The trust was designed and operated to the same end. When we consider that this trust was created in immediate connection with the oil leasing of these lands for a long term of years

and that it expressly empowered the trustees to lease the lands and to collect "all rents and income from the property," it is evident that the creators of the trust intended to carry on the same business enterprise respecting the same property as they had been doing under the former company and that they successfully formed the trust to that end. Of course, the trust contemplated entire disposition of the land. So did the corporation. We can find in this trust no purely holding company [such as in A. A. Lewis & Co. v. Commissioner. 57 S.Ct. 799, 81 L.Ed. ——, decided May 17, 1937] nor any purely liquidation trust [such as Commissioner v. Morriss Realty Co. Trust, 68 F.(2d) 648 (C.C.A.7), and Commissioner v. Atherton, 50 F.[2d] 740 (C.C. A.9)]. In this situation and since the evidence clearly shows and the court concluded that this trust "so far as its form of organization is concerned has enough of the elements of a corporation to be classified as an association," we must conclude that it was taxable as an association within the meaning of sections 13(a) and 701(a) (2) of the Revenue Act of 1928, 26 U.S.C.A. §§ 13(a) and note 1696(3), for the two years involved here.

The judgment is reversed with instructions to grant a new trial.