NEE, Collector of Internal Revenue, v. MAIN STREET BANK et al.

No. 13746.

United States Court of Appeals Eighth Circuit.

May 5, 1949.

Rehearing Denied June 6, 1949.

COLLET, Circuit Judge dissenting.

Louise Foster, Sp. Asst. to the Atty. Gen. (Theron Lamar Caudle, Asst. Atty. Gen., George A. Stinson and Ellis N. Slack, Sp. Assts. to the Atty. Gen., and Sam M. Wear, U. S. Atty. and Sam O. Hargus, Asst. U. S. Atty., both of Kansas City, Mo., on the brief), for appellant.

John H. McEvers, of Kansas City, Mo. (Reece A. Gardner, G. Lee Burns and Stinson, Mag, Thomson, McEvers & Fizzell, all of Kansas City, Mo., on the brief), for appellees.

Before GARDNER, Chief Judge, and JOHNSEN and COLLET, Circuit Judges.

JOHNSEN, Circuit Judge.

The questions are whether a certain trust was liable (1) for income taxes as an association, 26 U.S.C.A. § 3797(a) (3), and (2) for capital stock taxes as an association doing business, 26 U.S.C.A. § 1200(a).

The income taxes were for the calendar years 1939 to 1941 and the capital stock taxes for the fiscal years 1939 to 1943. The trustees had made fiduciary returns during these years, under 26 U.S.C.A. § 142, as for an ordinary trust. The Commissioner of Internal Revenue made assessments against the trust, of the association income taxes and capital stock taxes involved, in 1944. The trust had by that time been terminated and its assets conveyed to the beneficiaries. The beneficiaries paid the assessments made against the trust and duly instituted suit in the District Court for their recovery from the Collector. On a trial without a jury, the court gave judgment for the beneficiaries, 75 F.Supp. 597, and the Collector has appealed.

The trust agreement involved had been made in 1936 and grew out of the previous taking of title in trust to a ranch in Lea County, New Mexico, through mortgage foreclosure. The mortgage had been given in 1921 by some parties named Nymeyer, to secure a number of promissory notes, aggregating $33,341. The payee of the notes sold them severally, through an investment broker, to five banks. Upon a default in 1922, the banks had joined in executing a declaration of trust, constituting H. T. Mattern, an officer of one of the banks, as trustee, with title to all of the indebtedness and security rights, and with direction to collect or foreclose—"said Trustee to take title to any of said real estate or other property and sell the same upon credit or for cash, and apply all the proceeds of said sales or other cash received by him pro rata upon said notes."

Mattern, as trustee, took the title to the property through foreclosure in 1924. The ranch was primarily grazing land and there was no market for it at the time. All that Mattern was able to sell was one small piece of land out of the tract. The remainder he continued to hold until his death in 1935. Between 1928 and 1933, however, he and the beneficiaries had jointly executed oil and gas leases upon most of the property in favor of the Gypsy Oil Company, which thereafter assigned its rights to the Gulf Oil Corporation. These leases ran, subject to drilling operations being commenced by a certain date, or delay rentals being paid, to September, 1938, "and as long thereafter as oil, gas, or casinghead gas, or any of them is produced."

Up to the time of Mattern's death, there had appeared to be no prospect of salvaging the amounts of the beneficiaries' investments. Two of the banks had lifted the trust interests out of their assets and transferred them to their affiliated securities companies. A third bank had gone into receivership and its interest had come into the hands of an individual. In 1936, the holder of the oil and gas leases began to conduct drilling operations on the property, and there came to be talk and hopes of finding oil. In June of that year, approximately six months after Mattern's death, the two banks, the two securities companies, and the individual, then having the interests in the property, executed a new declaration of trust (which is the one here

involved), with themselves as beneficiaries, and with three persons as trustees, "in the place and stead of said H. T. Mattern, with respect to said real estate and leases formerly held by the said H. T. Mattern as trustee."

The terms of the agreement varied materially from those of the Mattern trust. The trustees were given no power to sell and liquidate the property. It was provided that the three trustees were to "hold title" to the property (whose legal description was set out and the proportionate interests of the beneficiaries in which were specified) as trustees for the settlors; that the trustees were to have "full power and authority to hold; manage, lease and handle said property or any part thereof, including the right to execute leases for oil, gas and mineral rights or for grazing purposes on said property or any part thereof, and to transact any and all business incident thereto, including the right to collect all income therefrom and disburse the same;" that the trustees should receive no compensation for their services but were entitled to make payment of necessary expenses in handling the property; that the trustees were not to be "personally liable in any manner whatsoever in the execution of this trust, except for misconduct that amounts to bad faith or gross negligence;" that, in case of any disagreement among them, the acts of any two trustees "shall be as valid and binding as if all of said Trustees had joined therein;" that in the event of the death, refusal, inability or failure of a trustee to serve at any time, a majority of the beneficiaries, "in the amounts of their respective interests," as set out in the agreement, should have the right to appoint a successor trustee or a trustee to succeed any successor trustee; and that any owner or owners of an interest in the property equal to 25 per cent of the whole might terminate the trust agreement at any time by filing in the office of the Recorder of Lea County, New Mexico, an instrument "declaring their intention to cancel the same" and mailing a copy thereof to each of the other beneficiaries.

The stipulation of facts contained in the record shows that the lessee's drilling operations resulted in a discovery of oil on the property almost immediately after the trust agreement was executed and that payment of royalties began to be made to the trustees in September, 1936. Such royalty payments continued to be made down to the revocation and termination of the trust in August, 1943. The trustees received during this period in royalties over $200,-000. The trial court found that as a matter of fact, however, the trustees had done practically nothing during their trusteeship, except to receive and endorse the oil checks and make distribution of the proceeds to the beneficiaries. The evidence showed that, outside of making payment of taxes, etc., their other acts had consisted in the executing of a grazing lease on the land, a water lease to the oil company, a water-lease release, a pipe-line easement, and an easement to the State for a right of way. All of this was done in an informal manner, by one trustee simply calling the others on the telephone, explaining the matter to each of them orally, and circulating such instrument as was to be executed, among them by mail, for signature.

Did the trial court err in its view that the trust was not a taxable association —either as a matter of law from the face of the instrument, or in its finding and conclusion from the evidence, under the test in United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, that, in actions tried without a jury, "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed?"

To permit a trust to be classified as an association for income tax purposes, it must (1) be initially created, or have been thereafter utilized during the tax period involved, as a vehicle for carrying on a business enterprise, and it must (2) have characteristics, under its written structure or in its adopted mode of operation, resemblant of a corporate organization. Morrissey v. Commissioner, 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263. Both of these features are requisites in making the in-

come of a trust taxable as that of an association. The first, however, is the substantive element, and the second is simply one of supportive but not invariable form. Helvering v. Washburn, 8 Cir., 99 F.2d 478, 481.

On the first feature, a trust cannot ordinarily be regarded as having been created for an enternrise purpose, or as having thereafter become converted into an enterprise, if its sole or dominant object and activity are a liquidation of the trust estate or a holding to preserve the trust property. Fidelity-Bankers Trust Co. v. Helvering, 72 App.D.C. 1, 113 F.2d 14, 19, and cases cited. "That transactions of a business character are necessary incidentally to (a liquidation or preservation of particular property placed in trust for that purpose) does not, without more, convert a trust having such primary objectives into a 'business enterprise'." "The ultimate question is whether the trust performs some nonbusiness function of this sort or operates a business enterprise as a going concern." Id., 113 F.2d at page 18.

The specification in a trust instrument of powers which normally involve the doing only of such business acts as traditionally and generally have been recognized as being incidents in the administration of an ordinary trust of the property may not therefore be given an artificial significance by attempting to read such powers as legal abstractions. But powers enumerated in the trust instrument, of a type or scope beyond the usual incidents in administering an ordinary trust, may properly be read abstractly and accorded their legal face significance. The parties to a trust are "not at liberty to say that their purpose was * * * narrower than that which they formally set forth in the instrument under which their activities were conducted." Helvering v. Coleman-Gilbert Associates, 296 U.S. 369, 374, 56 S.Ct. 285, 287, 80 L.Ed. 278. The intention, through the creation of a trust, to conduct a business enterprise may accordingly legally be inferred, for purposes of taxing its income as that of an association, from the enumeration in the instrument of powers which, if exercised, would necessarily cause such an enterprise to result. Whether such powers have actually been exercised or not is immaterial, for the fact that they have been expressly granted is income-tax-wise sufficient to entitle it to be held that the trust was created for enterprise purposes. Helvering v. Combs, 296 U.S. 365, 368, 56 S.Ct. 287, 80 L.Ed. 275. And even where there is no such express grant of special powers as to entitle it to be declared on the face of the instrument that the trust was created for enterprise purposes, the setting and circumstances involved in the creation of the trust and its nature may some times sufficiently establish that this was its actual object. Beyond this, and without regard to is original purpose, the trust may also still be taxable as an association, if the beneficiaries allow it to be used in fact as the vehicle for carrying on an actual enterprise (at least while it is being so operated), and where its written structure or form of adopted operation has resemblance to a corporate organization.

In the present case, as previously has been noted, the trust agreement authorized the trustees "to hold, manage, lease and handle said property or any part thereof, including the right to execute leases for oil, gas and mineral rights or for grazing purposes * * * and to transact any and all business incident thereto, including the right to collect all income therefrom and disburse the same."

The Collector argues that these, or some of them, on their face, are entitled to be declared entrepreneurial and not ordinary trust powers. But we do not think it can be said generally and abstractly that they necessarily are such powers as would not be granted to or be exercised by trustees of an ordinary trust in a holding of property for its preservation. The expression "hold, manage, lease and handle said property" does not per se and without some special setting transcend the incidents of an ordinary trust. It hardly automatically falls into the same category as an authorization, for example, to the trustees to buy cattle and engage in direct operation of the ranch, or to acquire equipment and carry on oil-drilling activities. Certainly the power to lease

a piece of farm or ranch property held in trust and collect the rent thereon may constitute simply a normal incident in the administration of an ordinary trust. Similarly, it seems to us that a mere right to enter into oil leases cannot in all situations be declared to amount to an intended or an inescapable grant of entrepreneurial power. It is common knowledge that numbers of such leases are made each year, on a nominal and routine basis, largely for preemption purposes, with no governing belief by the parties in an actual oil potentiality and not uncommonly without any thought, presently or in the future, of even making an exploration.

■ Of course, all of the powers mentioned (and particularly perhaps that of making oil leases) are also capable of having an entrepreneurial purpose or significance, but, if that was the situation here, it was a matter which rested in the setting or circumstances of the trust and which was not inherent from the face of the instrument. It follows that the trial court cannot be said to have erred in refusing to declare as a matter of law from the face of the instrument that the trust had been created for an enterprise purpose.

The question then becomes whether the court equally was entitled to hold, on the setting and circumstances of the particular situation, that the trust had not had the object or the result of permitting the carrying on of an enterprise. The test of this question, as we have indicated, is whether, on all the evidence, we are left on this review with the definite and firm conviction that the trial court was mistaken in its finding and conclusion. We have been unable to escape such a conviction in the present situation.

It is difficult, first of all, to reconcile the trial court's view with that of our decision in United States v. Rayburn, 8 Cir., 91 F.2d 162. Here, as in that case, the circumstance dominating the constituting of the trust seems clearly to have been the developing oil situation on the property at the time the trust was made. The situation had passed the stage of passive or routine leasing and had advanced to one of direct drilling activity and anticipated oil potentiality. The language we used in the Rayburn case would seem to be specifically applicable, that "It was in connection with and to take advantage of this activity that the * * * trust was made." 91 F.2d at page 168

Three trustees were provided for in the instrument, instead of one, as had been the situation under the Mattern trusteeship, in order, as the testimony admitted, to permit of a "broader representation" of the various interests involved, in relation to the activity. The trustees were given no power to liquidate the property, such as had existed in the Mattern trusteeship. Over 2,000 acres of land were involved. The oil potentiality of the property was apparently regarded as being such that the lessee had been willing in one of its previous leases to obligate itself to pay, in addition to a conventional one-eighth royalty, the further sum of $100,000 from the first oil produced, out of a 50 per cent share of its seven-eighths rights. It had further been willing to make a bonus payment of $2560 in order to obtain an extension of some of the leases.

And so, at the time the trust involved was created, the property manifestly had come to have a character and potentiality for oil purposes, where, in the making or renewing of any leases, as the trustees were empowered to do, bargaining astuteness would naturally be an important and intended factor. The trustees foreseeably in the crystallizing situation also could be called upon to exercise other commercial faculties and capacities. Thus, under the existing leases, the lessee had reserved the option to pay the royalties in cash or by delivery in kind of one-eighth of the oil produced, so that the trustees might have had the duty of marketing in the anticipated oil situation, what as a matter of fact amounted to more that $200,000 worth of crude oil during the period of the trust. Cf. Kettleman Hills Royalty Syndicate No. 1 v. Commissioner, 9 Cir., 116 F.2d 382. Again, to further the development of the oil situation on the property, the trustees, within their powers, executed a water lease in favor of the

lessee and also a subsequent release of some water rights. Some further color might perhaps be added to the situation, on the question of expectation and motive as related to seeming potentiality at the time, by the fact that, as mentioned, the trust's share of royalties, during the period of its existence, amounted to over $200,000.

[11] These circumstances and this setting, in their relation to the executing of the trust agreement, make it impossible for us, as we have indicated, to escape the definite and firm conviction that, within the view and the intention of the parties, their actions in constituting the trust did not rest on the level of setting up a conventional trusteeship for preservation of the property but rose to the height of providing an instrumentality to permit and facilitate exploitation of the property for profit. The object of the beneficiaries to capitalize to the fullest extent possible upon the immediate prospects and culminating developments, and to set up the machinery most convenient for the accomplishment of this purpose seems to us inexorably to stand out in the spotlight of the facts—which we repeat—that the trust was being reconstituted just as drilling activities on the property were coming to a head; that 2,000 acres of land were involved; that the property apparently was recognized as having a favorable oil potentiality, as evidenced by the provision in one of the leases for payments beyond the conventional royalty share and the bonus paid for a renewal of some of the leases; that in providing for more that a single trustee it was admitted that the intention was to make possible a "broader representation" of the various interests involved, in relation to the oil situation; that the trustees were given no power to liquidate the property, such as had existed under the original trusteeship, although the ranch was producing only a nominal grazing rental; that the trustees, in relation to the active oil developments, were being granted "full power and authority to hold, manage, lease and handle said property * * * including the right to execute leases for oil, gas and mineral rights * * * and to transact any and all business incident

thereto;" that the terms of the leases previously made indicated the opportunity and the necessary call upon the trustees to exercise bargaining astuteness in the making or renewal of any leases; and that under the existing leases and with the apparently immediate oil prospects the trustees were being placed in a position where they might be required to engage in the marketing of oil, if the lessee should choose to turn over to them in kind the trust's share of any oil produced.

That the situation thereafter so developed that the trustees found it necessary to do practically nothing as a matter of fact, except receive and endorse oil checks and make distribution of the proceeds is not controlling, for, where a trust has been created with the object of carrying on a business enterprise and its powers have been granted for that purpose, whatever income it has may still be taxed as that of an association even though it has not seen fit to exercise its entrepreneurial powers. Cf. Helvering v. Coleman-Gilbert Associates, supra, 296 U.S. 369, 374, 56 S.Ct. 285, 80 L.Ed. 278; Helvering v. Combs, supra, 296 U.S. 365, 368, 56 S.Ct. 287, 80 L.Ed. 275.

But appellees argue that, even if the trust here could be said to have been created for an enterprise purpose, it was lacking in corporate earmarks sufficient to permit it to be taxed as an association. Such resemblance on the part of a trust to a corporation as is necessary to permit it, where it has been created for an enterprise purpose, to be taxed as an association on its income is, as we have previously stated, a matter of supportive but not invariable form. It implies merely the existence of characteristics in its written structure or in its adopted mode of operation that remind patterningly of a corporate organization, though not identical therewith. Morrissey v. Commissioner, supra, 296 U.S. 344, 357, 56 S.Ct. 289, 80 L.Ed. 263.

The Morrissey case lists these five features as being characteristic generally of corporate undertaking: (1) holding of title; (2) centralized management; (3) continuity; (4) transferability of bene-

ficial interests; and (5) limitation of liability. 296 U.S. 344, at page 359, 56 S.Ct. 289, 80 L.Ed. 263.

All of these elements are present in the trust involved, except an express limitation on the beneficiaries' liability. The right to transfer beneficial interests in the trust existed without any qualification or restraint. Continuity and centralized management plainly existed. Appellees assert that the element of holding title was lacking, but to the extent that we need consider that question there is no merit in the argument.

There does not appear to have been any formal conveyance of title to the property made to any one from Mattern's heirs after his death. But Mattern, of course, had been merely a trustee, and in the trust agreement here involved the beneficiaries constituted the three trustees "in the place and stead of said H. T. Mattern, with respect to said real estate." The legal description of the property was set out and the trustees were given "authority to hold * * * said property." It was further provided that the trustees "hold title thereto as Trustees for the undersigned * * *." And when the trust was terminated, the beneficiaries took a deed of conveyance from the trustees to the property, thus treating them as being the holders of the title.

Whether the trustees had ever had a perfect record title, we need not consider. The holding of title, as an element of resemblance to a corporate undertaking, is of significance here only in its practical and not in its technical aspect. That the beneficiaries intended to vest the trustees with title is plain; the trustees furthermore held the property; and the beneficiaries took a conveyance from them when the trust was terminated. What record defects, if any, a title examiner might have been able to point out as to their holding is a matter of no concern in this collateral scrutiny.

■ Nor does the absence of an express limitation upon the liability of the beneficiaries make the trust in the present situation so deficient in its formal structure as not to permit it to be classified as an association. The beneficiaries may have decided that there was no practical need in the situation for such a limitation. But in any event, as said in Fletcher v. Clark, 10 Cir., 150 F.2d 239, 241, 166 A.L.R. 1456, the absence of that single indicative element "is not a conclusive factor" on the right to classify a trust as an association for income tax purposes. See also Pennsylvania Co. for Insurance on Lives and Granting Annuities v. United States, 3 Cir., 138 F.2d 869, 873, 874. The formal resemblances of the trust here to a corporation, in relation to its having been created to permit an enterprise to be carried on, are sufficient so that taxation of its income, as being the income of an association cannot be escaped on that ground.

The further and final question remains, whether, even though the income of the trust was taxable as that of an association, because of its creation for an enterprise purpose and its sufficient corporate resemblance, it also was so engaged in "carrying on or doing business" in fact, as to be further liable for capital stock taxes under 26 U.S.C.A. § 1200(a).

Reference has previously been made to the trial court's finding that the trustees had done practically nothing during the trusteeship "except endorse the checks for the oil runs and distribute the money to the owners." No attack has been made upon this finding.

■ Except where more than a passive significance is obvious from the purpose for which a corporation or an association was created or which it has been made to serve, the mere receiving of rent by it, routinely paid and distributed, on a piece of property which it owns and has leased, is generally not regarded as amounting to "carrying on or doing business" within the capital stock tax statute. Cf. Sears v. Hassett, 1 Cir., 111 F.2d 961, 964, 965; Cleveland Trust Co. v. Commissioner, 6 Cir., 115 F.2d 481, 483; McCoach v. Minehill & S. H. R. Co., 228 U.S. 295, 306, 33 S.Ct. 419, 57 L.Ed. 842; Zonne v. Minneapolis Syndicate, 220 U.S. 187, 31 S.Ct. 361, 55 L.Ed. 428; United

States v. Emery, Bird, Thayer Realty Co., 237 U.S. 28, 32, 33, 35 S.Ct. 499, 59 L.Ed. 825.

In the present case, however, the record shows that during the years 1939 and 1943 the trustees undertook to further or facilitate the progress of the oil exploitation by granting to the lessee a water lease and a release of further water rights, respectively. Under the purpose for which we have held that the trust was created, these were business acts in relation to the realization of profits from the developments on the property. As section 137.31 of Treasury Regulations 64 provides, "any corporation (or association) organized for profit and carrying out any of the purposes of its organization is doing business within the meaning of the (Internal Revenue) Code." As to the two fiscal years ending June 30, 1939 and June 30, 1942, the trust accordingly had a liability for capital stock taxes, as an association doing business during each of those years.

On the basis of what has been said, the judgment is reversed to the extent that it allows recovery of any of the income taxes involved and to the extent that it allows recovery of the capital stock taxes assessed for the two fiscal years ending June 30, 1939, and June 30, 1942.

Judgment reversed to extent indicated and cause remanded.

COLLET, Circuit Judge (dissenting).

I do not concur in the majority opinion for the following reason.

It is conceded that the declaration of trust did not require as a matter of law the conclusion that the trust was a taxable association. It is further conceded that the determination of the status of the trust for present purposes rested upon the proper factual conclusion to be drawn from the evidence. The trial court made definite findings on the determinative issue of fact and found from the evidence that the trust was not operated in such a manner that it could be characterized as a taxable association. The majority opinion concedes that

the trial court's findings in that regard have evidentiary support in the record. Those findings are set aside as "clearly erroneous" upon the hypothesis that this court is authorized to do so in spite of the clear admonition of Rule 52 of the Rules of Civil procedure,[1] because it is said that from the entire evidence this court is left with the "definite and firm conviction that a mistake has been committed" by the trial court in its findings. Reliance for such action is placed on United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746.

I do not believe the United States Gypsum Co. case was intended to or does apply to a case like this. Here the question of fact was a close one. That is amply demonstrated by the fact that the companion case of Nee v. Linwood Securities Co., 8 Cir., 174 F.2d 434, is affirmed upon substantially the same evidence, and upon the ground that the trial court's finding of fact, being supported by the evidence, may not be disturbed. The trial court treated the factual situation in the Linwood Securities Co. case as being identical with the facts in this case. The appellant (the same in both cases) makes no effort to distinguish between them. But in this case we find what in my judgment is only a shade of evidentiary difference between the two cases, and upon that difference, indistinguishable to the trial court or the appellant, we conclude that the trial court's evaluation of the evidence in this case was clearly erroneous because we have a firm and definite conviction that it made a mistake, while the finding in the other case is not disturbed. I do not believe that is the kind of a situation wherein we are authorized to substitute our judgment of the facts for the finding of the trial court. If I did think so I would have dissented in the very recent case of Woods v. Western Holding Corporation, 8 Cir., 173 F.2d 655, wherein the trial court found that the evidence showed the housing establishment in question was known as a hotel in the community in which it was located. An examination of the record in that case led me to the

---

[1] " * * * Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. * * * " 28 U.S.C.A.

very definite and firm conviction that that finding did not reflect the weight of the evidence. My respect for the judgment of the trial court did not enter into my concurrence in the affirmance of the judgment based upon that finding. It was controlled by a more rigid compulsion—the mandate of Rule 52.

The language used by the Supreme Court in the United States Gypsum Co. case was, in my judgment, intended to be applied in the classes of cases such as those where a finding was based upon a mere "scintilla" of evidence, or, when a finding was so patently wrong that to follow it would humiliate the intellect of the reviewing court. I do not think that such a situation is presented by the record in this case.

If the rule of "firm conviction" is applied in this case, it seems to me that the purpose and intent of Rule 52 will not only be once transgressed, but that it will lead to a disregard of the factual findings of trial courts whenever an appellate court has a "definite and firm conviction" that even a narrow margin of the weight of the evidence supported a different finding.