NEE, Collector of Internal Revenue, v. LIN-WOOD SECURITIES CO. et al.

No. 13747.

United States Court of Appeals Eighth Circuit.

May 5, 1949.

Louise Foster, Sp. Asst. to the Atty. Gen. (Theron Lamar Caudle, Asst. Atty. Gen., George A. Stinson and Ellis N. Slack, Sp. Assts. to the Atty. Gen., and Sam M. Wear, U. S. Atty., and Earl A. Grimes and Sam O. Hargus, Asst. U. S. Attys., all of Kansas City, Mo., on the brief), for appellant.

John H. McEvers, of Kansas City, Mo. (Reece A. Gardner, G. Lee Burns and Stinson, Mag, Thomson, McEvers & Fizzell, all of Kansas City, Mo., on the brief), for appellees.

Before GARDNER, Chief Judge, and JOHNSEN and COLLET, Circuit Judges.

JOHNSEN, Circuit Judge.

Like Nee v. Main Street Bank, 8 Cir., 174 F.2d 425, decided concurrently here-

with, this case involves the liability of a trust for income taxes as an association and for capital stock taxes as an association doing business.

As in that situation, the trust had been terminated before the assessments were made, and the beneficiaries, to whom the property had been conveyed, paid the taxes and sued in the District Court for their recovery. The court, on a non-jury trial, gave the beneficiaries judgment, and the Collector has appealed.

The situations in the two cases are similar in a number of respects, but there are also some material differences in the circumstances.

This trust, like that in the Main Street Bank case, arose out of the necessity of taking title to a ranch property, of 1560 acres, in Lea County, New Mexico. The ranch had been security for a series of notes which had been sold by an investment broker severally to some banks. Default occurred on the notes in 1922, and the banks involved joined in executing a declaration of trust, under which they assigned their notes to a named trustee, with authority to collect the indebtedness or foreclose the mortgage and "take title to * * * said real estate * * * and sell the same upon credit or for cash, and apply all the proceeds * * * pro rata upon said notes."

The mortgagor shortly afterward deeded the property to the trustee in satisfaction of the indebtedness. Because of the lack of a market for ranch property, the trustee did not succeed in disposing of any part of the land until 1928, when he sold 160 acres, with a reservation of the oil, gas and mineral rights.

During that year, the beneficiaries reconstituted the trust, under a new declaration, providing for three trustees instead of one, with the power of "management and disposition" of the property, "including the right to execute on behalf of the beneficiaries, oil, gas or mineral leases and the transaction of any business incident thereto and to execute and deliver oil and gas leases and leases for grazing purposes." Action by the trustees could be taken by the concurrence of a majority of them. The trustees were to have no liability ex-

cept for "conduct that amounts to bad faith or gross neglect."

Shortly after the constituting of the trust, the trustees gave a ten-year oil and gas lease on 440 acres of the property, with conventional rental and royalty provisions. They apparently were unable to dispose of any more of the land itself until 1932, when they sold the rest of it. The sale of the land returned only a part of the banks' investment. As on the preceding sale, the trustees retained or reserved the oil, gas and mineral rights in the property. The trustees did nothing else until 1934, when they executed an oil and gas lease on an additional 160 acres, under conventional rental and royalty provisions.

There was again a wholly passive period for about two years. Then, in 1936, the lessee undertook to do some drilling on the land and a discovery of oil resulted. From that time on, until the termination of the trust in 1943 (when the Commissioner had threatened to assess association taxes), royalty checks were paid to the trustees and they distributed the money to the beneficiaries. The only thing the trustees did during this period, according to the testimony, was to "sit there," receive the royalty checks as they were forwarded to them through the mail, and make distribution of the proceeds.

It will be noted that, unlike the Main Street Bank case, the trust here was not reconstituted at a time of or in relation to some proceeding or culminating oil development. The situation at the time seems to have been, as it also continued to remain for a period of eight years following the making of the trust, a simply passive one, and on the record before us the trial court could properly find that there had not been any expectation or belief by the beneficiaries of some change, in relation to which they had acted in 1928, when the trust was constituted, and which they were designing to exploit. The two oil leases which the trustees executed, during an interval of six years, were, as we have stated, in conventional form. They involved no bonus payments, or agreements to pay more than the ordinary royalty share, such as did the leases which were in existence in the Main Street Bank case

at the time that trust was constituted, and no other intensifying or evaluative incidents appear to have existed, such as those which prompted the creation of the Main Street Bank trust.

The present trust therefore could be regarded as not having been created in relation to any such setting of suggested potentiality, exploitable opportunity and manifest motive as the trust in the Main Street Bank case. This difference in factors would be entitled to be taken into account by the trial court in its appraisal of the purpose for which the trust was constituted, and also in our testing of whether that appraisal was clearly erroneous. In the Main Street Bank case, we felt that the conclusion was not reasonably escapable that that trust had been set up for entrepreneurial purposes, considering particularly the time of its creation, the developments then occurring on the property, the potentialities which had been recognized by the lessee in having entered into more than conventional leases, the apparent call upon the trustees to exercise bargaining astuteness in the making or renewing of any leases (as demonstrated by the terms of the previous leases), the powers granted to the trustees (and also that withheld, as previously permitted Mattern, of selling the property) read in the light of the whole situation, and the position of the trustees to do (and their having done, by granting a water lease and a release of other water rights to the lessee) acts intended to further as far as possible the immediate productive exploitation of the property.

 Applying to the trial court's findings in the different situation here the same test as in the Main Street Bank case, we do not feel able to say, with a definite and firm conviction, such as we had in that case, that the court was clearly mistaken in viewing this trust as not having been created for an enterprise purpose, but as having been intended simply to permit a liquidation or the prudent holding and preservation of the property in a passive situation. We should hesitate to go the length of declaring that no placing in trust of reserved oil, gas and mineral rights can possibly be recognized as being for an ordinary trust purpose, where there has been

given a power of leasing, but that such a trust must be regarded absolutely and in any situation as having been created for an enterprise purpose. As we said in the Main Street Bank case, "a mere right (in the trust) to enter into oil leases cannot in all situations be declared to amount to an intended or an inescapable grant of entrepreneurial power." 174 F.2d at page 430.

It was not unnatural that the beneficiaries, unable to recoup the amounts of their investments out of the sale of the property itself, should decide to hold on to the oil, gas and mineral rights, whether they had any actual value or not. And as a matter of fact, there is nothing to indicate that the reserved oil, gas and mineral rights might have had a market value at the time, except perhaps the circumstance that in the lease made shortly after the trust was constituted the lessee had agreed to pay a rental (conventional) of 50 cents an acre. It further was not unnatural for the banks, as financial institutions, in the passive situation, to place such rights in a simple trust, with power in the trustees incidentally to execute leases in case an opportunity to do so arose, but without under the circumstances having intended any enterprise purpose and without any enterprise having been produced as a result.

It was the trial court's view, as has been indicated, that the trust here was not created as an enterprise undertaking but for the purpose of prudently liquidating the remaining land or of passively holding and preserving any rights retained, and with a power in the trustees simply to perform incidental business acts in connection therewith. Formidable support for this view exists in the factors which we have mentioned—the lack of any pending oil development or prospect thereof at the time; the conventional nature of the leases which the trustees had the opportunity to make; the fact that at the time and for eight years following there was no drilling interest; and the apparent absence of any other indicated business potentiality in the situation when the trust was constituted. Nor had the trust at any time thereafter been converted into a business enterprise, for the evidence shows, as has been stated,

that even after drilling operations began eight years later the trustees did nothing except sit back and receive the oil checks sent them by the lessee.

On this setting and these circumstances, we are not, under the test in United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L. Ed. 746, "left with the definite and firm conviction that a mistake has been committed." In the absence of such a conviction (which we were unable to escape in the Main Street Bank case), we have no right to overturn the trial court's appraisal and finding, as being, within Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. "clearly erroneous."

That the trial court could have viewed the facts differently, or that we might perhaps have done so, if we had been the initial trier thereof, does not alone entitle us to reverse. Under Rule 52(a) and its interpretation in the United States Gypsum Co. case, there must exist a stronger basis for overthrowing a finding of fact than a mere difference in personal judgment. Such evidentiary weight and such convictional certainty must be present that the appellate court does not feel able to escape the view that the trial court has failed to make a sound survey of or to accord the proper effect to all of the cogent facts, giving due regard, of course, to the trial court's appraisal of witness credibility where that factor is involved. Here a closer margin for the exercise of our review function exists on the record before us than on that in the Main Street Bank case, on the basis of the difference in the time and the events in relation to which the trust was created, in the immediately preceding status of the property, in the seeming opportunity for exploitation which was involved, in the apparent purpose for which the powers were directly granted, and in the circumstances of the situation generally. Some different beneficiaries also were involved in the two situations. Reviewing the case in its own setting and on its own record, as the parties are entitled to have done, an attempt on our part to overthrow the trial court's appraisal of the situation, on the evidence before us would we believe, be more one of difference in personal judgment with the trial court on the facts than of definite and firm conviction on the whole situation that the court was clearly wrong.

If the trust did not constitute an association for income tax purposes, it was not an association either doing business, for purposes of capital stock taxes.

Affirmed.