**BUTLER et al. v. KRIZAN et al.**

**Civ. No. 2730.**

United States District Court
D. Minnesota, Fourth Division.
Jan. 4, 1949.

The above-entitled cause came on for trial before the undersigned without a jury.

George Hedlund (of Hall, Smith, Enkel & Hedlund), Minneapolis, Minnesota, for plaintiffs.

Arnold A. Karlins (of Levitt & Karlins), Minneapolis, Minnesota, for defendants.

NORDBYE, Chief Judge.

The question arises in this case as to whether or not the so-called residence hotel located at 825 Fourth Avenue South in City of Minneapolis was decontrolled on June 30, 1947. The parties have stipulated that defendant Daniel Krizan was operating this establishment as a hotel and that it was known as a hotel in the community on June 30, 1947. They have also stipulated that the rent collected from the remaining plaintiffs herein exceeded the amount authorized by the Area Rent Director and that unless defendant Krizan has established that the premises were decontrolled as of June 30, 1947, these plaintiffs are entitled to recover the amount of the overcharges. The amounts of the alleged overcharges are reflected in a written stipulation on file.

Under Section 202(c) of the Housing and Rent Act of 1947, 50 U.S.C.A.Appendix, § 1892(c), "controlled housing accommodations" were defined, and the exception to control included "(1) those housing accommodations, in any establishment which is commonly known as a hotel in the community in which it is located, which are occupied by persons who are provided customary hotel services such as maid service, furnishing and laundering of linen, telephone and secretarial or desk service, use and upkeep of furniture and fixtures, and bellboy service."

In Woods v. Benson Hotel Corporation, D.C., 81 F.Supp. 46, I concluded that Congress did not intend that all types of service named in the Act need be provided in all cases in order for a hotel to be decontrolled as long as the services provided constitute the customary hotel services usually supplied in establishments commonly known as hotels in the community where they are located. Moreover, that decision holds that all of the services need not be actually provided as long as they are made available with or without extra cost and whether or not they are accepted by the tenant.

This residence hotel was taken over by Krizan on or about April 1, 1945. He is the only remaining defendant, in that the Ballords sold their interest to Krizan under a contract for deed and never occupied the relationship of landlord with these tenants. There are 146 units in this hotel and they are divided into two classes —housekeeping rooms or apartments and so-called sleeping rooms. The latter are generally reserved for the transient trade, and of the 146 units about 38 are sleeping or transient rooms. The building has a lobby which is provided with a writing desk and stationery, a davenport and some chairs. There are mail boxes of the

pigeon-hole type where the mail of the tenants is placed by the clerk. The hotel has a register or card system on which transient guests register. A clerk is in attendance who registers transient guests, looks after the mail, and operates the telephone switchboard through which all telephone calls to and from the rooms are cleared. All tenants are charged six cents for each outgoing call, and this charge apparently pays for their telephone service. All units are furnished, and Krizan maintains the furniture, repairs the same, and employs two maintenance men for the building. The transient rooms are supposed to have maid service and linen service, which services are included in the room rent charged therefor. The housekeeping apartments are entitled to linen service, and upon request can receive maid service upon paying an extra charge. There are some 27 or 28 public baths for the use of the tenants in the building. Apparently, only about six housekeeping apartments have private baths. At one time there was an elevator in the building for the use of tenants, but it was condemned as unsafe, and during the period with which we are concerned the tenants have had no elevator service. The hotel consists of four floors. No bellboy service is provided.

The controlling question is whether or not the hotel furnished to its permanent guests, or made available to them, the type of services usually furnished by hotels in this community. Obviously, the quality of service available for guests in this hotel is not to be compared with the services available in a so-called first-class hotel. The rental charges indicate that this establishment is occupied by tenants of modest means.

One of the purposes which apparently motivated Congress in providing for the decontrolling of hotels was the assumption that hotels were subject to mounting costs in furnishing, and being required to furnish, the various facilities which the ordinary hotel was expected at all times to provide to its guests. Congress may have assumed that there were many intangibles by way of expense which could not be allocated to any particular rental space. And that situation might prevail even though the hotel did not furnish each and every one of the services enumerated in the Act. It is with these considerations in mind, therefore, that the Court should determine whether, under the showing herein, defendant has sustained the burden of proof is establishing that this particular hotel was decontrolled on June 30, 1947, within the meaning of the Act. It would seem that if this hotel fails to furnish or make available the usual and customary facilities ordinarily available to guests of a hotel of comparable standing, or if the services furnished or made available are wholly inadequate, it should not be accorded the exemption which the Act provides, and the wilfull or negligent failure of a hotel to furnish adequate service of any facility over a substantial period of time is not far removed from a complete denial of such service.

The evidence in this case is convincing that ever since Krizan took over the hotel in 1945 he has materially cut down the services which were formerly available to the tenants. This is true not only of the housekeeping tenants, but as to the transient guests as well. Particularly does it appear that the housekeeping tenants have received wholly inadequate linen service for their rooms since he entered into possession. He requires the permanent guests to bring their soiled linen to the desk in the lobby, and then they are supposed to have clean linen provided which they can take to their rooms. Substantially all of the housekeeping apartments do not obtain maid service, presumably for the reason that they do not care to pay the extra cost. But, upon occasions too numerous to mention during 1947, clean linen was not available to the tenants when the soiled linen was removed from their beds and taken to the desk. Sometimes a change of linen and towels would be available to them once a week; sometimes once in ten days; sometimes once in two weeks; and at other times a longer interval would elapse before clean linen was made available to them. This was due either to a lack of proper supervision or attention to the needs of the apartments, or the result of an

attempt to cut down expense in the maintenance of the hotel. Many of the tenants in the housekeeping apartments, in view of this situation, bought their own linen and did their own washing of the linen which they provided. I am not unmindful that some allowance should be made for possible exaggeration on the part of some of the witnesses in this regard. Undoubtedly, there may have been one or more tenants who evidenced a more than usual interest in the furtherance of this case, and their testimony may have been colored in an attempt to make out a convincing showing against Krizan. That bad feeling exists between some of the tenants and their landlord is quite evident. But giving due allowance to such factors, it would seem that one must conclude from the testimony that the availability of linen for the housekeeping rooms during 1947 was most unsatisfactory, and I come to this conclusion notwithstanding the testimony of defendant's witnesses as to the amount of linen purchased by Krizan for this hotel in 1947 and the laundry bills which were incurred by him for this hotel during that period.

The necessity of having clean linen at regular times in a hotel is so essential that no one can neglect such an indispensable service and expect to be accorded the privileges which the Housing and Rent Act assumes to grant to bona fide hotels.

Admittedly, this hotel failed to furnish any type of bellboy service for the tenants. This is true not only as to the housekeeping tenants, but as to the transient tenants as well. Defendant's attempt to establish that at times comparable service was furnished utterly failed. The undisputed facts are that when a guest came to the hotel and registered, he was given a key to his room and directed on his way by the clerk, and was required to find his own room and perform the services which the bellboy customarily furnishes in any hotel. He had to carry his own baggage, unlock the door to his room, turn on the heat if need be or open the windows if the occasion required it, and attend to the little details that any hotel guest expects will be taken care of when he enters his room. The occasions when one of the maintenance men,

or perchance the clerk, would perform any of such services were so infrequent that they are of no moment.

There were generally two maids who looked after the 38 transient rooms, the halls, lobby, bathrooms, etc. At times a third maid was called in to assist. We are not concerned with the quality of maid service for the housekeeping rooms, as these tenants, as heretofore stated, did not request maid service, although they presumably knew that Krizan would have made such services available to them upon request and upon payment of an extra charge. However, it does seem fair to observe that the public bathrooms were not given adequate maid service. They were littered with newspapers and other debris, showing an utter lack of attention by the maids. This cluttered condition may have been due to the fact that Krizan refused to furnish toilet tissue for the public bathrooms. He contends the reason the supply was scanty was because the tenants filched the tissue from the bathrooms, but, instead of a scanty supply, the undeniable fact is that Krizan furnished little, if any, toilet tissue for some 28 public bathrooms over a substantial period in 1947. Not only did he fail to furnish toilet tissue for the public bathrooms but he removed most of the radiators from the bathrooms, and there is credible testimony that some of the bathrooms were so cold that the tenants could not bathe safely therein in the winter time.

Admittedly, the permanent guests received some of the facilities usually afforded by hotels in this community. There was a lobby in the hotel, the clerk did clear telephone calls and put the tenants' mail in the proper boxes, and they did receive furniture and its upkeep for their apartments. But, in so far as the permanent residents of this hotel are concerned, it is to be doubted that one could properly call the building a hotel if there were no transient rooms, and the mere presence of transient rooms in an apartment house does not insure to the permanent guests that they are being furnished hotel privileges. And when some of the essential services are entirely lacking and others

which are furnished are as inadequate and as unsatisfactory as the evidence indicates herein, I am constrained to find that defendant has failed to sustain the burden of proof which rests upon him to establish that these apartments were decontrolled.

Plaintiffs' counsel concede that plaintiff Earl Rasmussen is not entitled to any recovery. I have already indicated in certain oral observations that I made at the close of the case that I believed Edna L. Dahlberg was barred from any recovery because of the dismissal or release she signed and that such document was based upon an adequate consideration. I adhere to that view. I must also conclude that the release or dismissal signed by Elizabeth Hodge is valid. Krizan testified as to the consideration therefor and there is no denial. However, as to the other releases or dismissals, I am of the opinion that the evidence does not indicate that they are based upon sufficient consideration.

This disposes of the principle questions involved. However, it is necessary to determine whether the violations were wilfull or due to failure of the defendant to exercise reasonable precautions to avoid the violation of the Act. In view of the conclusions indicated, it necessarily follows that defendant has also failed to sustain the burden imposed upon him in this regard. He certainly knew that he was not furnishing the type of services required in order to be decontrolled. But I am not disposed to allow treble damages, and am of the opinion that, under all the circumstances, one and one-half times the overcharge will serve the ends of justice. As to attorneys' fees, it must be recognized that the allowance that the Court makes in such a case is necessarily a moderate allowance, and in view of the circumstances it is my opinion that the allowance of $250 by way of attorneys' fees is fair and equitable.

Findings of fact and conclusions of law consistent herewith may be presented by the plaintiffs.

An exception is allowed to the defendant.