WOODS, Acting Housing Expediter, v. WESTERN HOLDING CORPORATION.

No. 13780.

United States Court of Appeals
Eighth Circuit.

March 23, 1949.

Carroll W. Berry and G. C. Downey, both of Kansas City, Mo., Ed Dupree, Hugo V. Prucha and Cecil H. Lichliter, all of Washington, D. C., and Lowell D. Gibbons and H. C. Happ, both of Dallas, Tex., for appellant.

William G. Boatright, of Kansas City, Mo., for appellee.

Before GARDNER, Chief Judge, and RIDDICK and COLLET, Circuit Judges.

GARDNER, Chief Judge.

This was an action brought by appellant, Acting Housing Expediter, seeking to enjoin appellee from charging and collecting over-ceiling rents and to prevent the eviction of tenants for failure to meet the demands of appellee for rental charges in excess of those established by the Housing Expediter. The parties will be referred to as they were designated in the trial court.

The properties involved are known as Casa Loma East and Casa Loma West, Kansas City, Missouri. Each building is nine stories high and has sixty-five units. In its answer defendant alleged that these particular properties were not subject to control because they had been decontrolled by congressional act. The action was brought under the Housing and Rent Act of June 30, 1947, 50 U.S.C.A.Appendix, § 1881 et seq. Section 202(c) of that Act defined controlled housing accommodations and the exceptions to such control as follows: "The term 'controlled housing accommodations' means housing accommodations in any defense-rental area, except that it does not include (1) those housing accommodations, in any establishment which is commonly known as a hotel in the community in which it is located, which are occupied by persons who are provided customary hotel services such as maid service, furnishing and laundering of linen, telephone and secretarial or desk service, use and upkeep of furniture and fixtures, and bellboy service."

Section 204(d) of the Act provides, "The Housing Expediter is authorized to issue such regulations and orders, consistent with the provisions of this title, as he may deem necessary to carry out the provisions of this section and section 202(c)."

Regulations and interpretations were promulgated by the Housing Expediter under date September 5, 1947, which contain the following: "There is no all-embracing definition in the regulation of what is commonly known as a hotel, and consequently each decision must be based upon the test of whether or not the particular establishment is commonly known as a hotel in the community in which it is located."

The parties entered into a written stipulation as to certain facts which by reference the court included in its findings of fact. Each of the parties offered oral testimony and documentary evidence supplementing the stipulated facts. The court found the issues in favor of the defendant and entered judgment of dismissal.

In seeking reversal plaintiff contends that the solution of the issues presented is dependent upon the answer to two questions: first, whether or not the properties were on June 30, 1947, commonly known as hotels in the community in which they are located, and second, whether or not these properties on that date provided the occupants of the housing accommodations with such customary hotel services as are habitually furnished in the community; to-wit, Kansas City, Missouri. The trial court determined both of these questions in the affirmative but the findings in that regard are challenged by the plaintiff.

■ The findings of the trial court are presumptively correct and should not be set aside on appeal unless clearly erroneous and due regard must be given the opportunity of the trial court to judge the credibility of the witnesses. Rule 52(a), Federal Rules Civil Procedure, 28 U.S.C.A. The trial court made detailed findings covering all the issues. These may be summarized as follows:

The Casa Lomas, the two properties here involved, on and prior to June 30, 1947 and thereafter, were commonly known as hotels in the community in which they are located, and were occupied by persons who were provided customary hotel services such as maid service, furnishing and laundering of linen, telephone and secretarial or desk service, use and upkeep of furniture and fixtures and bellboy service,

within the meaning of the Housing and Rent Act of 1947; that for many years prior to June 30, 1947, these properties were represented and held out by the owner and operator as being hotels; that they complied with the Missouri statutory provisions regulating the licensing and operation of hotels; that they were advertised by various methods as hotels; that the owner and operator consistently took the position, in dealing with public authorities and with the general public, that the establishments were hotels. That during said time all occupants of these establishments were received as such by signing the usual and customary hotel registration card in common use throughout the United States, and for many years prior to said date none of the occupants was offered or granted leases but all paid the established rates for occupancy on either a monthly, weekly or daily basis, and that the relation of landlord and tenant did not exist, but the relation of hotel keeper or inn keeper and guest did exist. That there were various types of hotels in the community, one being the commercial hotel, another the apartment hotel, and another the family hotel. That apartment hotels are generally divided into units containing one or more rooms with bath and kitchenette and dinette facilities in which the occupants may, if they choose, prepare their own meals, and that occupants of apartment hotels receive the usual and customary hotel services, consisting, among others, of those enumerated in the Housing and Rent Act of 1947. That all of these types of hotels are commonly known and understood in the community to be hotels, not only from the standpoint of the general public but from the standpoint of those who by virtue of their business experience are especially qualified to inform the court respecting such matter, and by the laws of the State of Missouri, both statutory and judicial. That plaintiff has repeatedly recognized the existence of these various types of hotels in the Kansas City community and has repeatedly recognized that they were decontrolled and that other apartment hotels are decontrolled, in which the essential characteristics not only of the buildings and equipment but of the services furnished, are legally and factually indistinguishable from the Casa Lomas, the properties here in question.

Many of these findings find support in the stipulation of the parties. In the stipulation the properties are described as, " * * * two buildings in Kansas City, Missouri, located at 103 and 107 Ward Parkway (sometimes called West Ward Parkway); that there is a canopy (canvas supported by a steel frame) extending from the front door of each building across the sidewalk and to the curb of the street; that on the canopy of the east building (103 Ward Parkway) there are printed the words 'Casa Loma East'; that on the canopy in front of the west building (107 Ward Parkway) there are printed the words 'Casa Loma West'; that these buildings are frequently referred to as Casa Loma East and Casa Loma West respectively. These buildings were constructed in 1928-29; each is nine stories in height; each contains 65 units, and each has a lobby extending across the entire front of each building on the ground floor and approximately 30 feet in depth, with an office in each lobby; that the buildings are adjacent to each other, being separated by approximately 20 to 30 feet; that there are no physical connections between the two buildings. * * *

"On and prior to June 30, 1947, and thereafter, the said 130 units consisted of rooms or suites of the following types: (then follows a detailed description of the rooms)."

On and prior to June 30, 1947, and thereafter, all units in the two establishments were supplied with furniture, furnishings and equipment consisting principally of furniture, bedding, bed pads, blankets, spreads, sheets, pillows, pillow cases, glass curtains or venetian blinds, draperies, carpets, tables, divans, bath mats, towels, shower-bath curtains, ironing boards and covers, lamps, lamp shades, electric light globes and equipment for kitchenette. The occupants were supplied with linen and laundry. The washable linen was supplied daily to units when transients were accommodated, and all towels were furnished daily to all occupants. Defendant

furnished to the occupants of each unit daily maid service. It provided the services of twenty-six employees for the operation and servicing of these establishments, the employees being classified as follows: one resident manager, one resident housekeeper, eight maids, two housemen, one janitor, five elevator operators, seven clerk-telephone operators and one general maintenance man.

Each unit was furnished with a telephone, with switchboard in the lobby. An employee was kept on duty at the desk or office in the lobby in each building twenty-four hours per day and acted as telephone operator in addition to other duties. The telephone numbers of these establishments have at all times been listed in the telephone book published by the telephone company in Greater Kansas City and listed in the classified section of the telephone directory under the classification "hotels," and not under the classification "apartments." The clerk-telephone operator, in addition to acting as a telephone operator, received messages for occupants, telegrams, mail and packages which he placed in the key box assigned to each unit. He accepted and dispatched telegrams, personal laundry and dry cleaning for the occupants and received the same upon return from the laundry or cleaning establishment and caused them to be delivered to the occupants by the elevator operator.

Each building had two elevators serving all floors. Regular elevator operators were on duty at one elevator in each building from seven o'clock a. m. to eleven o'clock p. m. Elevator service available after eleven o'clock p. m. was by automatic elevators operated by the occupants. During the hours from seven o'clock a. m. to eleven o'clock p. m., elevator operators wearing white duck jackets were instructed by defendant to render personal services to all occupants at the request of such occupants and such personal services as requested were furnished.

These establishments were licensed as hotels under the laws of Missouri. The population of Kansas City is approximately 430,000 inhabitants, and Greater Kansas City 750,000 inhabitants.

All the services mentioned in the stipulation as being provided by defendant were furnished without additional charge to the unit occupant, except for telephone service.

From this stipulation and from the undisputed oral testimony, we think it clear that these establishments provided the occupants with such customary hotel services as are habitually furnished in the community; at least, we can not say that the court's finding to that effect is clearly erroneous.

We pass therefore to the question of whether the establishments were commonly known as hotels in the community. This was a question of fact for the determination of the trial court. There was confessedly much conflict in the oral testimony on this question but the conflict has been resolved by the trial court in favor of the defendant. We do not think the evidence on this question was of such character as to compel the findings made by the trial court but the question before us is not whether the findings are such as this court might have made on the same evidence but whether it can be said that these findings are clearly erroneous. In considering this question the trial court, in a memorandum, among other things said: "The defendant produced evidence of well informed and experienced witnesses, such as hotel builders and hotel operators, who testified without exception that they were familiar with these properties and the manner of their operation. They said that in Kansas City there are three classes of hotels; viz, the regular, commercial or transient hotel, devoting the greater part of its business to the traveling public, the apartment hotel, and family hotel. These witnesses stated unequivocally that the two properties in question were apartment hotels and that, while they accommodated many permanent guests, they nevertheless made provisions for transient guests. It appeared, furthermore, that the properties in their operation were classified as hotels by the state regulatory and supervising authorities and paid an occupation tax as such."

The court referred to a recent Missouri case, Marden v. Radford, 229 Mo.App. 789,

84 S.W.2d 947, in which it was held that the occupant was a mere lodger. In that case the owner exercised the right of visitation and did not accord to the tenant the exclusive control of the premises occupied. As in the instant case, pass keys were in the control of the operator, and hence, the occupant did not have exclusive domination, but sustained the relation to the operator that a guest would sustain to the operator of a hotel, whether commercial, apartment or family.

The testimony referred to by the trial court as being unequivocal and convincing to the effect that the properties in question were apartment hotels was based upon certain facts appearing in evidence which to our minds at least, give further strength to these opinions. During the times in question defendant ran an advertisement in the daily Kansas City Star advertising these establishments as apartment hotels. All guests were required to register. In each room was posted a card showing the rate, whether daily, weekly or monthly, and the check-out hour for daily or transient guests. A card was posted in each room which stated in part:

"This hotel will not be responsible for money or jewelry left in rooms. A safe for the convenience of our guests is in the Front Office.

"On leaving room, please turn out lights and leave key at office.

"Important: Check-out time is 6 P.M. Otherwise charge for an additional day will be made."

There was a safe in the office and a supply of envelopes for the purpose of permitting guests to place their jewelry and valuables in the safe, and during the time in question many guests deposited valuables in the safe.

Advertising material in the form of match folders was in use. On the back of the match folders appeared the following: "Kansas City's Finest Country Club Plaza Apartment Hotels—Casa Loma East, 103 Ward Parkway, Casa Loma West, 107 Ward Parkway." These establishments were a part of the system known as Fels Hotels. On the registration cards the word "apartment" does not appear, but the word "room" does appear. The ledger sheet kept by the hotel for each guest registered is headed, "Hotel Guest Record." It shows the number of the guest's room, the rate, various charges, including telephone, tailor, laundry, telegrams and miscellaneous. Rooms are rented on a daily basis. Prior to World War two defendant employed uniformed bellboys, uniforms being furnished by the defendant, but because of man shortage during the war it became impossible to continue this service by uniformed bellboys and bellboy service was furnished by the elevator operators.

There was testimony that during one year the Casa Loma East had 65 units but there were 306 different guests during that year. During another year there were 315 guests in the 65 units, and there have been continuously transient guests accommodated during the period in question. During the year 1946-1947 there were between 150 and 200 registration cards of guests who were accommodated on a daily or weekly rate, and between 85 and 90 per cent of these persons were from outside of Kansas City. True, the transient business fell off in later years because of the housing shortage and a greater demand for space by permanent guests.

A Mr. Messerly, employed by plaintiff as an investigator and examiner of the Area Rent Director, testified that these establishments are apartment hotels and recognized as such by plaintiff, and that as such they were decontrolled. All of the apartment hotels noted in the records produced by the witness to which his attention was directed, with one exception, contained apartments equipped with cooking facilities.

■ It is apparently the theory of plaintiff that to come within the purview of the statute and regulations it must appear that the primary purpose of the establishment was to furnish entertainment and lodging for the traveler on his journey. It is insisted that the word "hotel" means "a place where transients are lodged and where there is no provision for individual cooking in rooms." We are here considering an act of Congress, and hence, we should ascertain, if possible, the intent of Congress, and this may be gathered not only

from the language of the act but from contemporaneous legislative history. Harrison v. Northern Trust Co., 317 U.S. 476, 63 S.Ct. 361, 87 L.Ed. 407; Roland Electric Co. v. Walling, 326 U.S. 657, 66 S.Ct. 413, 90 L.Ed. 383; United States v. American Trucking Associations, Inc., 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345.

When Congress was considering the bill which became the Housing and Rent Act of 1947, Mr. Wolcott, speaking for the committee to whom the bill had been referred, pointed out that nearly two years had been elapsed since V-J Day and, with the exception of two commodities, rent was the only item of the national economy regulated as to maximum price. For that reason certain types of housing accommodations were by this Act of 1947 to be excluded from control. Referring to Section 202 of the 1947 Act, the report says: "Since hotel accommodations rented to transient guests are not now subject to rent control, the effect of this provision is to remove from such control those hotel accommodations which are occupied by so-called permanent guests who are provided customary hotel services of the general character specified in this provision."

The legislative history disclosed by the Congressional Committee report in connection with the 1948 Act reflects the congressional interpretation of the Act of 1947. When the 1948 Act was under consideration, Senator Cain, reporting for the Committee on Banking and Commerce, said, among other things: "One of the difficulties grew out of the issuance by the Housing Expediter of a regulation which substituted the word 'including' for the words 'such as' used in the Act, in referring to the several types of services used for the purpose of determining what constitutes 'customary hotel services.' The effect of this regulation, of course, was to require that all the services specified in the law must be present before the housing accommodations were decontrolled. It is submitted this was not the intent of Congress when the 1947 Act was passed. For example, it was not intended that the failure to provide telephone service, or a bellboy, would necessarily prevent an establishment from being decontrolled. It may

be fairly said that the intent of Congress was that it was only necessary to see whether the services of the general character specified were available and if the hotel was, in general, a 'furnished service establishment,' it would be decontrolled."

When the 1948 Act was under consideration by Congress, the Acting Housing Expediter was called before the committee considering the bill. Referring to this fact, Senator Cain, in his report, said: "It is entirely likely that the Committee would have recommended further changes in the existing Federal rent-control law but for the fact that during the hearings on this matter, the Acting Housing Expediter agreed to change his instructions and procedures in such a manner as to carry out what the Committee feels was the intent of Congress in adopting the Housing and Rent Act of 1947."

Following, and apparently prompted by, the consideration of the 1948 Housing and Rent Act by Congress, the Housing Expediter issued his interpretation of Section 202(c), in which it is in part said: "Based upon the intent of Congress as expressed in the legislative history of the Housing and Rent Act of 1948, the word 'hotel' as used in the Act and the Regulations is interpreted to mean those establishments which on June 30, 1947, the effective date of the Housing and Rent Act of 1947, were commonly known as hotels in the community in which they were located, and which provided occupants of housing accommodations therein with customary hotel services. *The word 'hotel' is interpreted to include all types of hotels, such as transient hotels, residential hotels, apartment hotels, or family hotels."* (Italics supplied)

■ In view of this interpretation, the contention of counsel for plaintiff that the word "hotel" "means a place where transients are lodged and where there is no provision for individual cooking in rooms," is not tenable.

As Congress has provided its own definition of what shall constitute a hotel within the meaning of the Act, it is not helpful to consider the decisions of state courts arising under state statutes. The only ef-

fect of the state statute might be as to what is "commonly known as a hotel in the community in which it is located." Sections 9923–9955, Revised Statutes of Missouri 1939, Mo.R.S.A., defines what constitutes a hotel in Missouri, as follows: " * * * every building or other structure, kept, used, maintained, advertised or held out to the public to be a place where sleeping accommodations are furnished for pay to transients or permanent guests, in which ten or more rooms are furnished for the accommodation of such guests, whether with or without meals, shall for the purpose of this. article be deemed a hotel * * *."

As bearing on what may be commonly known as a hotel in Missouri it may be noted that the common law distinction between inn and tavern keepers does not exist. City of St. Louis v. Siegrist, 46 Mo. 593; Juengel v. City of Glendale, Mo.App., 164 S.W.2d 610.

We are of the view that the findings of fact made by the trial court can not be said to be clearly erroneous and the judgment appealed from is therefore affirmed.