**ADLER et al. v. NORTHERN HOTEL CO. et al.**

**No. 9822.**

United States Court of Appeals
Seventh Circuit.

Jan. 27, 1950.

Rehearing Denied March 23, 1950.

See also 175 F.2d 619.

Albert E. Jenner, Jr., Edward H. Hatton, Chicago, Ill. (Edward I. Rothschild, Poppenhusen, Johnston, Thompson & Raymond, Chicago, Ill., of counsel), for appellants.

Kenneth J. Marks, Robert Marks, Chicago, Ill., for appellees.

Before KERNER, LINDLEY and SWAIM, Circuit Judges.

SWAIM, Circuit Judge.

The question presented by this appeal is whether housing accommodations in an establishment, commonly known as a hotel in the community in which it is located, the occupants of which were provided customary hotel services, were decontrolled by Section 202(c) (1) of the Housing and Rent Act of 1947, 50 U.S.C.A. Appendix, § 1892, even though such establishment, on June 30, 1947, the effective date of the Act,

had no transient guests nor accommodations for transients.

This action was brought by tenants of the Winshire Arms Apartment Hotel to recover statutory damages for alleged rental overcharges. It it admitted that there were rental overcharges and that the plaintiffs were entitled to the judgment entered by the trial court unless the establishment in question was decontrolled by the 1947 Act, the applicable portion of which is as follows:

"Sec. 202(c). The term 'controlled housing accommodations' means housing accommodations in any defense-rental area, except that it does not include—

"(1) those housing accommodations, in any establishment which is commonly known as a hotel in the community in which it is located, which are occupied by persons who are provided customary hotel services such as maid service, furnishing and laundering of linen, telephone and secretarial or desk service, use and upkeep of furniture and fixtures, and bellboy services."

The defendant insists that, on June 30, 1947, the establishment was commonly known as a hotel in the community in which it was located and its occupants were provided customary hotel services; and that by reason of these two facts the establishment was decontrolled by virtue of Section 202(c) (1) of the Act.

The trial court found that the three basic services of hotels, maid service, furnishing and laundering of linens and use and upkeep of furniture and furnishings, were made available and rendered to the occupants of the various apartments in said establishment, and, apparently satisfied that the establishment thereby met the requirements as to furnishing customary hotel services, passed to the question of whether it was commonly known as a hotel in the community. On this question the Court stated in his memorandum opinion that [80 F.Supp. 776, 779]: "By general custom in the Chicago area only those establishments will be included within the scope of the term 'hotel' [as used in Section 202 (c) (1)] which appeal primarily to transient trade. Examples of this type are the Palmer House, Stevens Hotel, Drake Hotel, etc. The word 'primarily' is employed purposely for, admittedly, the mere fact that a building is operated, advertised and known as a hotel is not conclusive of the character of any particular occupancy therein, * * * ."

The trial court stated further that an essential attribute of a hotel, whether it be transient, residential, family or apartment, is that it should have available, continuously, some accommodations for guests and that to be a guest of a hotel it is necessary that the person should be a transient. The Court pointed out that there was no testimony to the effect that the principal characteristic of the occupancy of the Winshire Arms Hotel was that of transiency, or that it was held out to the community as such. The court held that it was not a hotel and not decontrolled.

On this theory and construction of Section 202(c) (1) the trial court excluded evidence which, in our opinion, would have tended to show that the Winshire Arms Apartment Hotel was commonly known as a hotel in the community in which it was situated.

A review of the legislative and administrative history of Rent Control is necessary to a correct interpretation of the provision which we are here considering.

The Emergency Price Control Act of 1942, 50 U.S.C.A. Appendix, § 921, created the Office of Price Administration, placed the same under the direction of a Price Administrator and gave to such Administrator the power, by regulation or order, to establish such maximum rents as in his judgment would be generally fair and equitable and would effectuate the purpose of the Act.

Under this authority of the Administrator, housing accommodations were divided into two categories and rent regulations were accordingly issued for: (a), Housing (8 Fed. Reg. 7322) and (b), Hotels and rooming houses (8 Fed. Reg. 7334). Under these regulations all hotels which did not cater primarily to transients were required to register under, and be governed by, the Rent Regulations for housing.

Those regulations defined "hotel" as follows: "'Hotel' means any establishment generally recognized as such in the community, containing more than fifty (50) rooms and used predominantly for transient occupancy." The Housing Regulations (§ 6) did not permit the eviction of a tenant so long as he continued to pay his rent. As a consequence, transient guests, in establishments which were not occupied predominantly by transients, could not be evicted, and the establishments eventually were, therefore, occupied by only permanent guests. In the instant case, while the Winshire Arms had no transient guests or accommodations on June 30, 1947, there was uncontroverted evidence to show that at an earlier date the management "catered to the transient trade" and that "during the war that was changed to more or less permanent."

In 1946 Congress amended the Price Control Act of 1942, 50 U.S.C.A. Appendix, § 902(b), by adding the following paragraph: "After the date upon which this paragraph takes effect [June 30, 1946], the Administrator, when establishing rent ceilings on hotels or when passing upon applications for adjustment of rent ceilings on hotels, is authorized to take into consideration the distinction between transient hotels, and residential or apartment hotels, including the difference in the investment, operation, expenses, and mechanical details of operation between the transient hotels and the residential and apartment hotels, and is directed to classify separately by regulation (1) transient hotels, (2) residential and apartment hotels, and (3) tourist courts, rooming houses and boarding houses."

Under this authority the Price Administrator revised the rent regulations for hotels under the title "Rent Regulations for Transient Hotels, Residential Hotels, Rooming Houses and Motor Courts." Such Rent Regulations defined transient hotels and residential hotels as follows:

"§ 13(13). 'Transient hotel' means an establishment which (a) is customarily known as a hotel in the community (b) contains 15 or more dwelling units, (c) provides services customarily supplied by transient hotels, and (d) had less than 50% of its accommodations occupied by permanent guests (on monthly or weekly basis) during the quota month * * *

"§ 13(15). 'Residential hotel' means an establishment which (a) is customarily known as a hotel in the community, (b) contains more than 25 dwelling units, (c) provides services customarily supplied by residential hotels, and (d) had 50% or more of its accommodations occupied by permanent guests (on monthly or weekly basis) during the quota month."

It is significant to note that the definition of a "residential hotel", issued by the Administrator, did not limit such a hotel to an establishment furnishing some transient accommodations, but said that it was an establishment which had "50% or more" of its accommodations occupied by permanent guests. This definition would apply literally to an establishment having 100% of its accommodations occupied by permanent guests.

On February 1, 1947, the Office of Price Administration, by amendment of the rent regulations governing transient hotels and residential hotels, decontrolled all rooms in such establishments rented on a daily basis.

It was with this background of legislative and administrative history that the Housing and Rent Act of June 30, 1947, was enacted on the expiration of the Emergency Price Control Act of 1942.

A consideration of this history prior to June 30, 1947, makes it perfectly clear that in connection with the subject of rents, the Congress and the Price Administrator were using the word "hotel" as being applicable to transient hotels, residential hotels and apartment hotels. The first Rent Control Act, considered by the House Banking and Currency Committee in 1947, would have limited the decontrol provision of 202(c) (1) to transient hotels. This bill was rejected, however, and the bill finally enacted contained the provision above quoted which did not limit the establishments decontrolled to any particular type of a hotel.

After the passage of the 1947 Act, the Housing Expediter issued a regulation which in effect required that at least 25% or more of the accommodations in an establishment having self-contained dwelling units (including a bathroom and kitchen) be occupied by transients in order to qualify as a "hotel" under the Act. This regulation, which added a "transiency" test, was revoked shortly after it was issued, thus indicating that, after further consideration, the Housing Expediter did not interpret Section 202(c) (1) as requiring that an establishment have some transient residents to qualify for decontrol. At a later date, on July 1, 1948, the Office of the Housing Expediter published its official interpretation with respect to the decontrol of accommodations in hotels by the 1947 Act, (13 Fed. Reg. 5784). In that interpretation the word "hotel" was "interpreted to include all types of hotels, such as transient hotels, residential hotels, apartment hotels and family hotels." The interpretation explained, however, that it was clear from the legislative history that Congress did not intend to exempt from control housing accommodations in establishments which, on June 30, 1947, were not commonly known as hotels in the community in which they were located but were known as apartment houses, apartments, rooming houses and boarding houses.

Neither the Housing and Rent Extension Act of March 30, 1948, nor of March 30, 1949, changed the two requirements for decontrol which were provided by Section 202(c) (1) of the 1947 Act. This amounts to ratification by Congress of the prior interpretations, definitions and administration by the Housing authorities. We must, therefore, assume that Congress was using the word "hotel" in Section 202 (c) (1) of the 1947 Act as including transient, residential and apartment hotels, and was not limiting the word "hotel" to an establishment catering primarily to transients.

There was valid economic reason in 1947 for Congress to decontrol apartment and residential hotels. In his testimony in the House Hearings, when the various provisions of the Housing and Rent Act of 1947 were being considered, J. E. Frawley, Chairman of the Board of the American Hotel Association said in part: "May we deal first with the serious problem of residential hotels. Ours is a service industry, and should not be compared with other types of multiple housing. All other service industries in the United States have been decontrolled * * * Up to 60% of the total operating costs of a residential hotel are for service. This is where a hotel differs from other types of multiple housing which rents only bare space. It is these service costs, including labor and materials and supplies, where the major increases have occurred in the past 5 years."

This argument was apparently accepted by Congress as shown by the following statement of Mr Wolcott, Chairman of the House Banking and Currency Committee, when the Housing and Rent Extension Act of 1948 was under consideration and when various members of Congress were trying to bring apartment and residential hotels back under control: "Last year we gave a great deal of thought and consideration to this subject. The committee, and later on the Congress, decided that because of the increase in the cost of the services which were furnished the occupants of these accommodations they should be decontrolled. We decontrolled transient rooms and we decontrolled finally those rooms in hotels occupied by these so-called permanent guests where they were receiving hotel services such as maid service, linen service, maintenance of furniture, bellboy service, telephone service and secretarial service, for the reason that the increase in the cost of these services justified it. It was taken into consideration that in these cases the landlords or owners were selling not only accommodations, not only shelter, but services as well. Of course controls had been taken off similar or comparable services in all other lines."

The trial court recognized that services rendered to transients provided a sound economic reason for decontrolling "those establishments whose costs had been increased so drastically by reason of the transient nature of their business." However, at the time the 1947 Act was passed rooms rented to transients on a daily basis

had already been decontrolled by administrative order and the 1947 Act made it a requirement for decontrol that the guests be provided "customary hotel services". It would seem that those "customary hotel services" would cost approximately the same whether rendered to a transient or to a permanent guest. It would also seem clear that since the rooms occupied by transients on a daily basis had been decontrolled prior to June 30, 1947, Section 202 (c) (1) of the 1947 Act could only have been intended to effect decontrol of accommodations occupied by persons on a more or less permanent basis.

We have been cited to no decision, nor have we found one, which has expressly decided the question of whether it was necessary to decontrol under Section 202(c) (1) that an establishment had, on June 30, 1947, some transients or accommodations for transients. Some of the trial court decisions cited by plaintiffs contain dicta favorable to plaintiff's contentions, but none has considered and decided our particular question.

In the memorandum decision of Butler et al. v. Krisan et al., D.C.Minn.1947, 88 F.Supp. 692, the court states: "But insofar as the permanent residents of this hotel are concerned, it is to be doubted that one could properly call the building a hotel if there were no transient rooms * * *."

This statement was made, however, by the court in discussing the question of whether the hotel there was furnishing "customary hotel service." In that case the parties had stipulated that the defendant was operating the establishment "as a hotel and that it was known as a hotel in the community on June 30, 1947." In that hotel there were some sleeping rooms which were generally reserved for the transient trade.

In Caldwell v. Hazelton Apartment Hotel Corporation, D.C.N.D. Ill. E.D., 88 F.Supp. 1012, the court found that the building there in question was not commonly known as a hotel in the community in which it was located; and that the occupants within said building were not provided with customary hotel services. There all of the units within the building were rented on a monthly or weekly basis to permanent tenants. In that case, however, even if there had been transients, other facts found by the court would have furnished a sound basis for the conclusion that the establishment was not commonly known as a hotel and did not furnish customary hotel services.

In Creedon, Housing Expediter, v. Lunde, D.C.W.D. Wash., 1947, 90 F.Supp. 119, 121, the court in a decision granting a temporary injunction, after reciting the definition of "hotel" from Webster's New International Dictionary and from American Jurisprudence, stated that, "Under the general language or definition, clearly, the premises known as the Virginia Lee do not constitute a hotel. Under the ordinary viewpoint, premises where there is found no hotel register, no transient guests, no rooms or accommodations for the night, is not deemed a hotel. Ordinarily, when we speak of a hotel we expect to find an establishment that caters substantially to the transient traveler." In his opinion, however, the court stated that such general definitions as were found in the dictionary were not helpful to him in that case, because, as the court said later in his opinion, "The law [§ 202(c)(1)], however, makes a hotel something different than ordinary usage has made it." The court then defined a "hotel" as it is defined by Section 202(c)(1) and after a full consideration of all the facts, including the fact that most of the tenants supplied all or part of their own furniture, determined, that, pending a trial on the merits and a final decision, the establishment could not be considered as a hotel furnishing customary hotel services to the occupants.

In other decisions we find that other courts have indicated the availability of accommodations for transients as one of the factors which was considered in determining whether the establishment qualified for decontrol as a hotel.

It is our opinion, however, that under Section 202(c)(1), an establishment, which had neither transients nor accommodations for transients on June 30, 1947, might have

been commonly known on that date as a hotel in the community in which it was situated and have been decontrolled by that Act if it met the other requirement of furnishing customary hotel services.

We cannot determine this question by ancient definitions of a hotel. In early days and under primitive conditions it was necessary for an establishment to furnish food, lodging, drink and stables for horses in order to bring it within the legal definition of an inn. "Hotel" and "inn" were long considered as synonymous terms. When the days of travel by horses passed, establishments were gradually defined as inns or hotels even though no accommodations for horses were available. As more time passed it was also thought unnecessary that an establishment furnish drink in order to be considered as a hotel. In later years hotels were common which made no pretense of furnishing food. In comparatively recent times, especially in the larger cities, we have come to look upon apartment or residential hotels as a recognized and established type of hotel even though accommodations in such hotels, constitute complete living units with facilities for cooking and eating. This latter class of hotels, by their very nature, cater primarily, and in some instances, entirely, to permanent guests. When Congress passed the 1947 Act, it undoubtedly intended to decontrol accommodations in this type of hotel as well as in the transient type of hotel, if the occupants were furnished customary hotel services.

In Woods v. Western Holding Corporation, 8 Cir., 173 F.2d 655, 659, the court affirmed the judgment of the trial court which held that the two establishments there being considered were commonly known as hotels in the community and provided the occupants with customary hotel services, as required by Section 202(c)(1) of the 1947 Act. In that case the establishments did have some accommodations for transients. The court, however, rejected the theory of the plaintiff that to come within the decontrol provisions of the Rent Act the primary purpose of the establishment must be to furnish entertainment and

lodging for the traveler on his journey, and stated, "we are here considering an act of Congress, and hence, we should ascertain, if possible, the intent of Congress, and this may be gathered not only from the language of the act but from contemporaneous legislative history." After reviewing the legislative history of the Act and emphasizing that the word "hotel", as used in the Act, had been interpreted by the Housing Expediter to include all types of hotels, such as transient hotels, residential hotels, apartment hotels and family hotels, the court, 173 F.2d at page 660, said:

"In view of this interpretation, the contention of counsel for plaintiff that the word 'hotel' 'means a place where transients are lodged and where there is no provision for individual cooking in rooms,' is not tenable.

"As Congress has provided its own definition of what shall constitute a hotel within the meaning of the Act, it is not helpful to consider the decisions of state courts arising under state statutes. The only effect of the state statute might be as to what is 'commonly known as a hotel in the community in which it is located.' "

In Woods v. Benson Hotel Corporation, 8 Cir., 177 F.2d 543, at page 547, it was pointed out that at the time the 1947 Act was enacted practically all ceiling prices had been removed and that accommodations in "typically transient hotels" had been decontrolled. The court then said: "Hence, the Rent Control Act of 1947 in providing for the removal of controls on housing accommodations was intended to have further application than to transient hotels. In defining the types of establishments which were to be decontrolled, Congress could have either specified exactly what services had to have been furnished on a certain date in order for an establishment to be decontrolled, and provided for the application of that rigid yardstick throughout the Nation, with the resulting greater uniformity and effectiveness of enforcement, but also with a correspondingly greater number of 'hardship cases' caused by the application of such an unelastic criterion to the many and varied practices and customs ex-

isting in different geographical sections of the country and the disruption of those customs, sometimes long-existent; or it could have drafted a more flexible Act which would extend decontrol to establishments which were commonly known in their community as hotels and which furnished the hotel accommodations and services which hotels in that community usually supplied, in the manner such services were usually supplied by hotels in the community, and thereby leave the question of whether a given establishment was a hotel and furnished the usual hotel accommodations to be determined in the light of the local customs and practices in the community in which the establishment was situated. Congress obviously chose the latter course."

So in the instant case to properly apply the first test of decontrol set out in Section 202(c)(1) we must determine, not whether the Winshire Arms Apartment Hotel fits the general dictionary definition of "hotel" but rather, whether this establishment was commonly known as a hotel in its community.

Consideration of the language of Section 202(c)(1), of the legislative and administrative history of Rent Control, both before and after June 30, 1947, of the economic reason for decontrol of residential and apartment hotels, and of the decisions in which the general subject has been considered, leads us to conclude that: (1), Congress, in defining which establishments qualified for decontrol, did not intend to fix any hard and fast rules, but rather intended qualification for decontrol to be determined as a question of fact in accordance with the concepts and customs of the particular community wherein the establishment is located; and, (2), Congress did not intend that some transient occupancy be an absolute requirement for a residential or apartment hotel to qualify for decontrol.

Transiency thus becomes only one of the factors that in some cases aids in determining whether the establishment in question is commonly known as a hotel in the community in which it is located.

It necessarily follows that the defendant should have been permitted to introduce evidence tending to prove that the establishment here in question was commonly known as a hotel in its community even though there was no transiency as to June 30, 1947. The failure of the trial court to permit this constituted error for which the judgment must be reversed and this cause remanded for further proceedings consistent with this opinion.

Reversed and remanded.