**FEELEY v. WOODS, Housing Expediter.**

No. 12549.

United States Court of Appeals
Ninth Circuit.

June 15, 1951.

Rehearing Denied July 23, 1951.

Mark M. Litchman, Seattle, Wash., for appellant.

Ed Dupree, Gen. Counsel, Leon J. Libeu, Asst. Gen. Counsel, Francis X. Riley and Benjamin Freidson, Special Litigation Attys., Office of Housing Expediter, Washington, D. C., for appellee.

Before STEPHENS, HEALY and BONE, Circuit Judges.

BONE, Circuit Judge.

In this action the Housing Expediter sought (a) an injunction restraining appellant from renting or offering for rent any of the accommodations in what the Expediter claimed to be a controlled multiple unit housing accommodation in Seattle, Washington, and (b) an order directing appellant to restore the sum of $4056.08 to certain named tenants by way of restitution this being the aggregate of certain specified sums claimed to have been collected as rentals from these tenants during the period from about September 1, 1948 to about January 17, 1949. These sums were claimed to be in excess of the maximum rentals as the same were established pursuant to the provisions of the Housing and Rent Act of 1947 as amended in 1948, 50 U.S.C.A.Appendix, §§ 1881–1906, referred to herein as the Act, and the action was brought under authority of Section 206(b) of the Act for violation of Section 206(a) of the Act.

On or about June 5, 1948 appellant purchased the Seattle structure here involved. For a long time prior thereto it had been operated as a low class apartment house accommodation containing 17 unfurnished apartment "units." The building was in an unsafe condition and was threatened with condemnation by the authorities. Appellant evicted the tenants in order to make certain required repairs (including a new roof) and thereafter and on or about September 1, 1948 reopened the repaired structure for occupancy.

From a stipulation of certain facts and other facts shown in the evidence the following matters and things were clearly established as facts. The apartment house when purchased by appellant was under "rent control" and the schedule of rents applicable thereto had been previously established by an Order of the Rent Director of O.P.A. made on June 3, 1943. Appellant did not make any structural changes in the physical layout of the 17 apartment units in the building but redecorated all of these apartments and generally rehabilitated them. He changed the units from unfurnished to furnished units, installed refrigerators, provided maid service, bedding and linen, laundry of linen, lights, cooking fuel and dishes and utensils. All of these additionally provided "services" and facilities were made available to and utilized by the tenants in whose behalf this suit was brought. An awning was placed in front of the rehabilitated structure bearing the legend "Feeley's Apartment Hotel."

Desiring to see the changes made and because of the contentions of appellant [1] the trial judge personally inspected the premises. Appellant took the position that under his new system of operating this old apartment enterprise he had really "converted" the former apartment house into a "hotel", this because under his system he was supplying his tenants with what amounted to "hotel services." He believed that he had a moral and legal right to charge his tenants daily, weekly and monthly rates which he did until February 21, 1949 at which time the Housing Expediter brought the instant suit wherein he challenged appellant's right to charge

---

[1.] Appellant also argues that Seattle would have lost available housing accommodations had the building he purchased been condemned and removed. His purchase of the old structure and his rehabilitation work actually "created" seventeen "new" apartments.

these claimed "hotel rates." This was the posture of the case when it reached the district court.

The trial judge foreshadowed his Findings and Conclusions in an oral opinion in which reference was made to the many repairs and improvements made by appellant. He noted that the previously authorized rent schedule [2] was made for apartment units wholly unfurnished in a dilapidated and leaking building with inadequate and ineffective plumbing whereas under appellant's new operation the plumbing and lighting facilities and the walls and roof had been repaired and the walls decorated, new and attractive furniture for the units was added along with new ranges and new refrigerators. Various new services, including maid service, linen, and towel service were supplied, all of which left no room for comparison between a proper rental for the apartment and services rendered by appellant as against rental for the totally inadequate unfurnished apartment units listed under the earlier rent schedule (schedule of 1943, see Footnote 2).

The oral opinion also pointed out that the premises had not been freed from rent control and were neither a hotel nor generally considered or reputed as such in the community. The court emphasized that the rehabilitated apartments and the new services provided for tenants therein did make the tenancy under appellant *unique* in that the tenants were not required to rent the apartments on a month to month basis, but could readily obtain them on a daily basis, weekly basis, monthly basis, or a combination thereof. The judge was quite evidently impressed with the fact that appellant's operations were not those of

the orthodox apartment house in that appellant was giving services to tenants which were quite similar to many which were provided by regular hotels and that the tenants were reasonably well satisfied. The court also expressed the view that appellant, in good faith, believed that he had the right to make the charges he did and in good faith believed that his new enterprise was freed from rent control under the Act—this because of the "hotel" status he claimed and because of the expenditures he had made.

■ The court formally found that appellant's structure is not, and has not been, a hotel in the community, nor is it nor has it been known as such within such community, nor were additional housing accommodations created by conversion; that the rentals established by an Order of the Rent Director of the Office of Price Administration made on June 3, 1943 were not changed or adjusted until the Expediter did make an adjustment of rentals by an Order dated May 18, 1949 which was made effective as of January 17, 1949. (Footnote 2). These findings are supported by the facts in evidence and are not clearly erroneous.

Formal conclusions of law recite generally that appellant's structure is a controlled housing within the meaning of the Housing and Rent Act of 1947 as amended, and that in the exercise of sound discretion the determination of any restitution due justly and fairly should be predicated on rental rates fixed in the (retroactive) Order of May 18, 1949 rather than on the "maximum rent technically in effect" (under the old 1943 Order) during the rather short period of occupancy of the tenants

2. The court found, inter alia, that on June 3, 1943 an Order was made and entered by the Rent Director of the Office of Price Administration fixing and establishing rental for the various apartment units within the structure purchased by appellant in June of 1948; and that these rentals remained unchanged until a rent adjustment was made by an Order issued on May 18, 1949 by the Office of Housing Expediter. This Order was made to operate retroactively to January 17, 1949. The findings recite that

the Order of May 18th was made because of the substantial changes made by appellant. This Order appears to have resulted from an application by appellant for an "adjustment" of rents and the rent schedule set up in this Order was used by the court as the basis for its calculation of the proper and fair amount to allow tenants by way of restitution based upon claimed overcharges during the period here involved, i. e., from September 1, 1948 to January 17, 1949.

here affected; that this was the proper measure of restitution because the increased rentals established in and by the Order of May 18, 1949 were a just, fair and equitable basis for restitution in light of the fact that the tenants had enjoyed the services, equipment and improvements during their term as tenants and appellant had acted in good faith in making his rental charges.

Other conclusions entered dealt with the question of a just and proper restitution to be allowed, and indicated the basis adopted by the court in arriving at that amount. These conclusions covered various uncertain tenancies over the period here involved and the rates to be allowed in such cases, this in the light of equitable considerations stemming from the very peculiar and unusual circumstances of this case. We think that the conclusions of law adopted by the court are fully supported by the findings.

The computation of "overcharges" based on the foregoing conclusions resulted in a judgment by the court that such overcharges should be fixed in the sum of $1498.31. Judgment was accordingly entered granting the injunction prayed for and directing appellant to forthwith pay said amount into the registry of the court and providing that upon proper written application the Clerk should pay over to each of the tenants listed in the judgment the amount which the court had found should be paid to such tenant as his proper measure of restitution.

We think that the judgment reflects a fair and equitable solution of the unusual problem confronting the trial court[3] and should be affirmed. However, appellant's vigorous contention that adoption of appellee's theory would result in a misapplication of the law applicable to the particular facts of this case suggests the propriety of a more specific discussion of appellant's arguments which are summarized:

(1) Appellant's accommodations are a "hotel" and therefore exempt from control.

(2) Appellant's conversion and rehabilitation work "created new housing."

(3) The right to sue for restitution of overcharges is a right limited to tenants.

(4) The rates established by the Housing Expediter were not equitable.

The foregoing points are considered in the order presented.

## Point One

In order to lawfully establish that the premises here involved are exempt from rent control (on the theory that they are *now* being operated as a "hotel,") the evidence would have to show that appellant's establishment was, on June 30, 1947, enjoying the status of a "hotel" by common knowledge in the particular community where it was then located, *and* that customary "hotel services" were *then* being furnished to occupants of this hotel. However, the evidence in this case clearly establishes (and it is conceded) that on June 30, 1947 the establishment which appellant purchased was in the same location and was then being operated solely as a low class apartment house under rent control and that it continued as such until appellant purchased the apartment structure in June of 1948. It is clear that under applicable law *both* of the above noted requirements for "decontrol" and exemption as a hotel must have co-existed on June 30, 1947 in order to validate appellant's claim that his establishment *now* enjoys a hotel status.[4] See Section 202(c) (1) Housing and

---

3. Appellee does not attack the judgment and the basis therefor but merely seeks affirmance.

4. The first regulatory change in hotel regulation (of interest in this case) occurred on January 17, 1947. It was effected by Amendment No. 102 (12 Fed. Reg. 395) which provided for the decontrol of daily rates on rooms occupied by transient guests and its practical effect was to decontrol all wholly transient

hotels and transient rooms in hotels which catered to both transient and permanent guests. Upon enactment of the Act of 1947 on July 1, 1947, the Congress provided an exemption from rent control for all hotels which (then) satisfied specific standards plainly prescribed in that Act but the hotels so decontrolled (by Section 202(c) (1) of the Act) had to meet certain standards existing on the effective date of the Act. These statu-

Rent Act of 1947. The authorities (cited in Footnote 5) dealing with this point have clarified this issue and leave no doubt on this score.

Though it might be argued that appellant's present venture, measured by some standards, could be considered a "hotel," the court found as a fact that it was not a hotel; this finding has support in the evidence and is binding on us. No contention is made on this appeal nor was proof offered at the trial that on June 30, 1947 the then rent-controlled apartment house enjoyed the status of a hotel by common knowledge in its particular community and that customary hotel services were then being furnished to its tenants. We agree with appellee that the cases which reflect the rule of law applicable to the instant situation indicate clearly that in order for appellant to prevail in this action the burden was upon him to show that his establishment met the "hotel status" requirements which conformed to the statutory requirements above noted on what has been termed "the cut-off date" of June 30, 1947.[5] This he failed to do.

tory provisions were in effect during the period of alleged violations in the instant case—September 1, 1948 to January 17, 1949. The language of Section 202(c) (1) was implemented by Controlled Housing Rent Regulation (12 Fed.Reg. 4331) issued by the Expediter on June 30, 1947 and its language was in harmony with that of Section 202(c) (1). It is of special interest to note that Section 204 (d) of the Act laid special emphasis on the Expediter's authority to issue regulations relating to Section 202(c).

On or about April 1, 1948, the Expediter, issued Amendment 27 to the Regulation issued on June 30, 1947 (effective July 1, 1947) which 1948 Amendment (see 13 Fed.Reg. 1861) more specifically reflected the use of the June 30, 1947 reference date. Amendment 27 did "ease" the more rigid "hotel service" requirements (of the Regulation issued June 30, 1947) in that it provided that "hotels" which had enjoyed a hotel status on the cut-off date need not necessarily provide all of the types of services named in the 1947 Regulation as long as enough are provided to constitute customary hotel services usually supplied in establishments commonly known as hotels in the community where they are located. In short, this 1948 Amendment 27 and the history of enforcement and interpretation of the Act clearly show that the Expediter had been using June 30, 1947 as the date determining whether housing accommodations could qualify for decontrol. Congress was well aware of this fact. See House Report 1611, 80th Congress, 2nd Session. (We have indicated in this opinion (see footnote 5) the court found against appellant on the fact issue of whether his establishment was a hotel and was "commonly known" as a hotel in its community and Amendment 27 cannot help appellant.)

By an "interpretation" published on July 1, 1948, (13 Fed.Reg. 3673) after extensive amendments of the Act on April 1, 1948, the Expediter prescribed June 30, 1947 as the "test date" for determining decontrol, and announced therein that if any housing accommodation meets the test as of June 30, 1947 it will not be subject to control by reason of any decreases in service after such date, nor will such accommodation be decontrolled even though some of the customary (hotel) services which were not provided on June 30, 1947, were subsequently provided.

A House Conference Report (No. 332) to accompany H.R. 1731 which commented (see page 17) upon provisions shortly thereafter to be enacted into law (Housing and Rent Act of 1949), is a revealing document. Among other things this report said: "The conference substitute makes no change in present law for housing accommodations in hotels in cities of less than 2,500,000 population * * * (2) the term 'hotel' means any establishment which on June 30, 1947, was commonly known as a hotel * * *." (Emphasis added.)

From all of the foregoing it would hardly seem open to serious debate that the Congress was fully aware of the Expediter's use of June 30, 1947, as the date to determine the character of the housing accommodations in qualification for decontrol.

5. See: Woods v. Western Holding Corp., 8 Cir., 173 F.2d 655, 660; Woods v. Benson Hotel Corp., 8 Cir., 177 F.2d 543; Woods v. Oak Park Chateau Corp., 7 Cir., 179 F.2d 611; Woods v. Kourmadas, 6 Cir., 180 F.2d 255, 257; Adler v. Northern Hotel Co., 7 Cir., 180 F.2d 742.

If it be assumed that the conclusions here expressed concerning the legal effect of the so-called "cut-off date" do not square with, or may serve to weaken, the force of our holding in Koepke v. Fontecchio, 9 Cir., 177 F.2d 125, the specific finding of the trial court in the in-

## Point Two

Appellant stipulated at trial that "the same units in the same space existed upon reopening as existed prior thereto." On the issue of conversion and rehabilitation the court found as a fact that no additional housing accommodations were created by conversion. It is unnecessary to labor this point since this finding is amply supported by the evidence. We point out that subsequent to the effective date of the (amending) Housing and Rent Act of 1948, April 1, 1948, and prior to the renting of the accommodations here involved the Expediter issued a series of interpretations and published them on August 25, 1948 (13 Fed.Reg. 5001–03). In these it was provided that "where there has been a structural change involving substantial alteration or remodeling, decontrol occurs *only* if additional housing accommodations result from this work"—whether "additional housing accommodations" are created is determined "by comparing the number of dwelling units before and after the conversion."

With these interpretations of record, the Congress again amended the Act, Housing and Rent Act of 1949, and in amending Section 202(c) (3) (A) Congress not only approved the prior regulations and interpretations but wrote these provisions into the Act itself.[6] Both Senate and House Committees accepted and adopted the "conversion" interpretations of the Expediter. See comments on the "conversion" problem in Woods v. Ginocchio, 9 Cir., 180 F.2d 484 and Elma Realty Co. v. Woods, 1 Cir., 169 F.2d 172.

## Point Three

We find no merit in appellant's contention that a right in this case to sue for restitution of overcharges is a right which may be exercised only by the tenant.[7]

## Point Four

In footnote 2 we referred to the Expediter's rental Order issued on May 18, 1949 (effective as of January 17, 1949) which appears to have been made in response to a petition for a rental adjustment filed by appellant on January 17, 1949. The Order granted the increases requested in the petition and made these increases effective as of January 17, 1949. No appeal was taken from the Order although Revised Rent Procedural Regulation No. 1 (13 Fed.Reg. 2369) provided for such an appeal. There is a well recognized principle that administrative *remedies* must be exhausted before one may resort to equity. See our holding in La Verne Co-Op. Citrus Ass'n v. United States, 9 Cir., 143

stant case that appellant's structure is not, and has not been, a hotel in the community, nor is it nor has it been known as such within such community, nor were additional housing accommodations created by conversion, is sufficient in itself to justify and require affirmance of the judgment.

6. We think that there can be no serious dispute that where, as here, there has been a Congressional reenactment of a law which has been interpreted by regulations in the manner we have noted, such reenactment provides weighty evidence and a strong inference of legislative approval of administrative interpretation. The legislative history of the Act makes plain that the Congress was well aware of the application by the Expediter of the so-called "cut-off date" as applied in rent control cases and Congress thereafter made no change in the law applicable to facts like those in this case as a result of such knowledge. See comments in

Footnote 4, supra. Congressional committee reports other than the ones cited in Footnote 4 make plain Congressional knowledge of the enforcement policy of the Expediter. See also such cases as Bowles v. Wheeler, 9 Cir., 152 F.2d 34, 38; Pinkus v. Porter, 7 Cir., 155 F.2d 90, 93; Woods v. Oak Park Chateau Corp., 7 Cir., 179 F.2d 611, 613; United Labor Committee v. Woods, Em.App., 175 F.2d 967, 969.

7. Woods v. Richman, 9 Cir., 174 F.2d 614; Woods v. McCord, 9 Cir., 175 F.2d 919; Woods v. Gochnour, 9 Cir., 177 F.2d 964. Cases from other Circuits are in harmony with the views expressed in the three noted cases from the Ninth Circuit, Woods v. Witzke, 6 Cir., 174 F.2d 855; Ebeling v. Woods, 8 Cir., 175 F.2d 242; Woods v. Wayne, 4 Cir., 177 F.2d 559; Greider v. Woods (Bennett v. Woods), 10 Cir., 177 F.2d 1016; Woods v. Wolfe, 3 Cir., 182 F.2d 516.

F.2d 415. We have applied the same rule to administrative *orders* in Woods v. Kaye, 9 Cir., 175 F.2d 886 and Babcock v. Koepke, 9 Cir., 175 F.2d 923. The contention advanced under point four is without merit.

An aspect of this case, which provoked comment in appellee's brief, merits a brief reference. So far as the record indicates appellant has not as yet applied for a possible "adjustment" based upon Section 5(a) of the Regulations (Part 825, Amendment 92, 14 Fed.Reg. 2233) which relates to housing accommodations not yielding a fair net operating revenue. This avenue of relief through the medium of the administrative process apparently remains open to appellant, therefore he is not in position to invoke some form of equitable relief at our hands based on a mere assertion that his rents are not "fair and equitable." We call his attention to the fact that on April 1, 1949, the Congress provided for a fair net operating income to landlords. Section 204(b) (1) of the Act. This provision of law was implemented on May 1, 1949 by a Regulation providing for a fair net operating income and establishing a formula to attain it—(Amendment 92, 14 Fed.Reg. 2233).

We agree with appellee that in any event appellant's failure to obtain statutory benefits to which he may be entitled is not a ground for decontrol of his property.

The judgment is affirmed.